In the Matter of Michael NEWMARK,
Debtor.

NATIONAL BANK OF NORTH
AMERICA, Plaintiff,

v.

Michael NEWMARK, Defendant.

Bankruptcy No. 180–05556–16.
Adv. No. 180–1057.

United States Bankruptcy Court,
E. D. New York.

June 1, 1982.

Cole & Deitz, New York City, for plaintiff; Edward N. Meyer and James J. Terry, New York City, of counsel.

Leinwand, Maron, Hendler & Krause, New York City, for defendant/debtor; Robert Rubinger, New York City, of counsel.

MANUEL J. PRICE, Bankruptcy Judge.

This is an adversary proceeding brought by the National Bank of North America (the BANK), a creditor of Michael Newmark (NEWMARK or the DEBTOR), to have its claim against the debtor declared non-dischargeable pursuant to Section 523(a)(2)(A) of the Bankruptcy Reform Act of 1978 (the CODE), 11 U.S.C. § 523(a)(2)(A).

On September 17, 1980, Newmark filed his voluntary petition for relief with this court under Chapter 7 of the Code, 11 U.S.C. § 701 *et seq.* He listed among those creditors having unsecured claims without priority in his schedule A–3, a debt which he owed to the National Bank of North America in the sum of $7,450,000. This debt evidently represented the deficiency judgment in the sum of $7,374,208.05 which the Bank had obtained against him based on his co-guaranty of a mortgage made by a corporation controlled in part by him, to the Bank. (Plaintiff's Exhibit 1) The Bank filed a proof of claim in this case in the sum of $7,855,451.10 on April 17, 1981. (Proof of claim filed by the National Bank of North America on April 17, 1981)

On December 3, 1980, the Bank filed a complaint objecting to the dischargeability of its debt. After several delays, a trial was held on the issues raised by the pleadings. Lasting four days, the trial generated nearly 500 pages of testimony. A summary of the facts adduced thereat is provided to set this matter in proper perspective.

The debtor has been an accomplished builder-developer who, through his partnership with another developer, Lawrence Rosano (ROSANO), was responsible for the construction of several major projects, mostly large-scale residential complexes, built in Queens, New York during the late sixties and early seventies. (Tr., pp. 331–32)

In September of 1972, Newmark and Rosano, representing their corporation, Village Mall Properties, Incorporated, began what would be a series of negotiations with General Telephone and Electronics, Laboratories, Incorporated (GTE), for the purchase

of a tract of basically undeveloped land owned by the latter in Bayside, Queens. (Tr., pp. 26–27)

The property deservedly generated much enthusiasm among the prospective buyers. Described as "one of the last remaining highly desirable suburban areas in New York City" (Plaintiff's Exhibit 19, "Background Information" sheet), the parcel consisted of 28.095 acres located at Willets Point Boulevard on Long Island Sound. The situation of the property afforded scenic views of the Sound and Manhattan, as well as easy access by such major highways as the Clearview and Long Island Expressways, and the Cross-Island Parkway. In addition, the many attributes of the surrounding community of Bayside, in conjunction with the proximity of mass transportation facilities, further contributed to the site's potential for successful residential development.

At this first meeting, Newmark learned that GTE's "asking price" for the parcel was $12 million. (Tr., p. 28) Due to the fact that the property was zoned for light manufacturing use and that Newmark and Rosano required the property to be rezoned for higher density residential use, their original offer was contingent on their acquiring a zoning variance. (Tr., p. 29)

GTE was at this time also pursuing sales discussions with five other prospective purchasers. (Tr., p. 30) As of November 28, 1972, the highest bid GTE had received was a non-contingent offer from one Alexander Muss in the amount of $8,750,000. (Tr., pp. 33–35) This bid was greater than the offer submitted by Newmark and Rosano, which was then $8,500,000. (Tr., p. 36)

When GTE failed to respond to their offer, Newmark and Rosano became concerned and contacted representatives of GTE who informed them that it had received a "better offer" than they had submitted. (Tr., pp. 37–38) Despite repeated requests by them, GTE refused to divulge the amount of this higher offer. (Id.) A meeting among GTE's representatives and Newmark and Rosano was thereupon held on December 7, 1972 to enable the latter to make a counter-offer. This meeting culminated with GTE's immediate acceptance of their offer to purchase the property for $10 million in cash, not subject to their obtaining the zoning variance mentioned above. (Tr., pp. 39–40) Newmark confirmed this agreement by a letter composed during the meeting and addressed to GTE. (Plaintiff's Exhibit 5)

On the following day, December 8, 1972, a meeting for the signing of the contract for the purchase of the property was held. Up to this time, it was understood by GTE's representatives that Newmark and Rosano would be purchasing the land in the name of their corporation, Village Mall Properties. (Tr., p. 43) On this day, however, Newmark designated an entity named American European Development Corporation (AMERICAN EUROPEAN) to be the buyer whose president, Remo Tinti, Esq., appeared that afternoon to sign the agreement on its behalf. (Tr., p. 44)

American European was a nominee corporation owned and controlled by Newmark and Rosano. (Tr., p. 93) Every official act of its president, Tinti, was directed by the debtor and his partner. As Newmark himself testified on cross examination:

"Q American European was your nominee, was it not?

A That is correct.

Q Mr. Tinti did what you told him to do?

A That is correct.

Q You told him to come to the December 8th closing and he came?

A That's correct.

Q You told him to sign that agreement and he did?

A Yes.

Q He signed all the documents, which I have shown to you in the last few minutes, relating to this transaction?

A If his signature appears there, then he did.

Q And when he did it, he did it because you told him?

A That's correct."

(Tr., p. 345)

It should be noted that this day also apparently marked Tinti's first involvement with the transaction to purchase the GTE property. (Tr., pp. 43–44, 88–89)· In fact, the first time he saw the purchase agreement was on December 8, 1972. (Tr., p. 88) In retrospect, the entire extent of Tinti's participation in this undertaking as of this date consisted of merely his *pro forma* presence at this meeting and of his signing the contract as the president of American European. (Tr., pp. 90–91)

As GTE had not had any dealings with American European nor with its president, it insisted that Newmark and Rosano personally guarantee performance of the contract, to which they agreed. (Plaintiff's Exhibit 7; Tr., pp. 341–42) Having secured the personal guarantees of Newmark and Rosano, GTE then signed the contract for the sale of the property to American European, dated December 8, 1972. (Plaintiff's Exhibit 6) This contract, in its final form, provided for a $10 million cash purchase price and stipulated that the closing would take place on June 8, 1973. (*Id.* at pp. 2–3)

Following the signing of the purchase agreement on December 8, 1972, the succeeding events essentially bifurcate into two distinct sets of facts. Although the contract provided for the closing to take place on June 8, 1973, it was delayed several times due to Newmark's inability to obtain sufficient financing necessary to complete the acquisition of the property. (Tr., p. 50) Thus, in one category there are those facts concerning Newmark's subsequent dealings with GTE and, in another, are those facts regarding his efforts to secure the financing for the closing. To avoid confusion between these two simultaneously occurring events, my rendition of the facts will treat them separately by the categories and order just described.

After the December 8, 1972 purchase contract was entered into, a rather curious document entitled by the misnomer "PURCHASE AGREEMENT" was executed on January 2, 1973 between Rosano and Newmark and American European. (Plaintiff's

Exhibit 12) The first three paragraphs of this 14-page document provide as follows:

"Purchase Agreement made this 2nd day of January, 1973 by and between AMERICAN. EUROPEAN DEVELOPMENT CORP., a New York corporation with principal offices at 217 Broadway, New York, New York 10007, hereinafter described as the Seller and MICHAEL NEWMARK and LAWRENCE ROSANO, hereinafter described as the "Purchasers". In consideration of the mutual promises each to the other made herein, Seller and Purchasers agree as follows:

1. All references made herein to Seller shall, for the purposes of this Purchase Agreement be applicable to the fee owners of the subject property. The parties hereto acknowledge that the Seller is the contract vendee of said property and that American European Development Corp. does not presently own said property and that in the event it is not the fee owner at the time of the delivery of the deed and closing of title hereunder, that it shall assign all its rights, title and interest in such contract and the property described herein to Purchasers, free and clear of all encumbrances.

2. Seller shall sell and convey, and Purchasers shall purchase all the plots, pieces of parcels of land, with the buildings and improvements thereon erected, situate, lying and being at Bayside in the Third Ward of the Borough and County of Queens, City and State of New York, bounded and described as follows. . . ." (*Id.*)

Without question, this lengthy agreement was, in effect, an assignment to Newmark and Rosano from one of their nominees of its right to purchase the property for $5 million more than it had agreed to pay GTE. Newmark, in response to questions put to him by opposing counsel at trial, described the nature of this agreement in the following:

"Q In fact, the transaction between American European and you, that is reflected in the January 2 agreement, is a transaction between one of your nominees and yourself?

A  That is correct.

\*  \*  \*  \*  \*  \*

Q  The purchase price reflected in the January 2 agreement is $5 million more than you agreed to pay GTE?

A  Yes, that is correct."

(Tr., pp. 345–46)

In a deposition taken of Newmark that was read into the record, Newmark explained that this transaction between himself and his nominee served several purposes. One of the purposes of this transaction that Newmark recalled was that it would have enabled him to shield from the local community the fact that he and his partner Rosano were involved in the purchase of the GTE site. (Tr., pp. 346–47)

Another purpose of the assignment proffered by Newmark at trial was that the transaction would have permitted him to syndicate the project, once he secured the rezoning of the property, at a higher price than the actual purchase price. This would have been accomplished by selling limited partnership interests in the project based on a value of $15 million to individuals as outside investors for profit and for the benefits provided by a tax shelter. As Newmark explained:

"'You will recall, the original structure was as a tax shelter, designed to buy at 10 and flip at 15. American European was buying at 10 and flipping for 15 to Systems Home Improvement.'" (Tr., p. 177)

In apparent disregard of the potential fraud against investors present in his proposed syndication, Newmark stated that the goal of this limited partnership agreement would be to allow him and Rosano to make a $5 million profit, based on the fact that the purchase price for purposes of investment would be $15 million, while the "real" purchase price was $10 million. (Tr., pp. 357–58)

The form of the January 2, 1973 agreement, in addition, generates some interest. Its text, for the most part, is a verbatim transcription of the December 8, 1972 agreement, duplicating its predecessor in all respects except that the January 2, 1973 document provides that 1.) the buyer and seller are respectively Newmark and Rosano and American European, in place of American European and GTE, respectively as the original buyer and seller; and that 2.) the purchase price would be $15 million instead of $10 million. In adapting the December 8, 1972 purchase agreement however, the makers of the January document, in an apparent oversight, included a paragraph completely unchanged from the December agreement which impliedly referred to the original parties, GTE and American European, instead of the parties designated in the January agreement.

On June 11, 1973, Newmark and Rosano sent a letter concerning the January agreement to Tinti, the president of their nominee corporation, American European, confirming the extension of the closing date. (Plaintiff's Exhibit 17) This letter apparently anticipated an agreement subsequently reached on June 14, 1973 between GTE and American European to delay the closing of the December contract to September 6, 1973. (Plaintiff's Exhibit 8) Typical of his prior role, Tinti had nothing to do with the conduct of these negotiations except to sign the amendment of the contract. In fact, Tinti had no contact at all with GTE after December 8, 1972 except for his signature on the amendment until the closing which was held nearly a year later on November 8, 1973. (Tr., pp. 51–52)

The next transaction affecting the GTE property was an assignment by Newmark and Rosano of their interest in the January 2, 1973 agreement to Systems Home Improvements, Incorporated (SYSTEMS), another nominee corporation owned and controlled by them. Undated and signed by Tinti for American European, as assignor, and by Rosano for Systems, as assignee, this half-page document provides:

"ASSIGNMENT

"For value received, the undersigned do hereby assign a certain Contract between GTE LABORATORIES, INC. and AMERICAN EUROPEAN DEVELOP-

MENT CORP., dated December 8, 1972, as amended, together with all right, title and interest of AMERICAN EUROPEAN DEVELOPMENT CORP. thereto to SYSTEMS HOME IMPROVEMENTS INC. of 42–40 Bell Boulevard, Bayside, New York, and said assignee hereby assumes all of the obligations of the Purchasers thereto.

"DATED:

AMERICAN EUROPEAN DEVELOPMENT CO
(Assignor)
By:___Remo Tinti, Pres (signed)___
SYSTEMS HOME IMPROVEMENTS, INC.
(Assignee)
By:___Lawrence Rosano (signed)___
Lawrence Rosano, President"

(Plaintiff's Exhibit 16)

The September 6 closing date was again delayed, due to the fact that a title search revealed a "gore" on the property, which resulted in a reduction in the purchase price by GTE of $62,000 to $9,938,000. (Plaintiff's Exhibits 21 and 22; Tr., pp. 150–151) A new date was set (Plaintiff's Exhibit 23), and finally the closing was consummated thereon. On November 8, 1973 GTE, by deed, conveyed the property to Systems Home Improvements Inc. (Plaintiff's Exhibit 11) in return for a cashier's check in the amount of $8,477,455. (Plaintiff's Exhibit 10) The total purchase price was $9,938,000. (Plaintiff's Exhibit 9; Tr., p. 56)

As of November 8, 1973, Newmark's and Rosano's dealings with GTE terminated. This day marked not only the closing of their purchase of the property, but was also the day on which they successfully completed their mortgage arrangement with the National Bank of North America providing the essential financing for the GTE sale. The events leading up to the latter include the following.

After the signing of the December 8, 1972 purchase agreement with GTE, Newmark communicated with Sidney Weniger (WENIGER), the president of General Resources Associates, Ltd., a mortgage broker with whom he had done business before to assist him in obtaining mortgage financing of $12 million for the purchase. According to a cover letter dated December 11, 1972, Newmark sent him a copy of the December purchase agreement between GTE and American European. (Defendant's Exhibit A; Tr., p. 275; *but see* p. 279) It is the conclusion of this court that although Weniger testified that he did not receive a copy of this contract (Tr., pp. 122–23), the evidence supports the opposite conclusion. I note in particular the fact that Plaintiff's Exhibit 19a, which was included as part of a mortgage presentation package prepared by Weniger's organization for Newmark and Rosano reflects information that was more likely acquired from the December contract, including the date attributed to it, December 11, 1972, the date of the letter, which was three weeks prior to the execution of the agreement between American European and Newmark and Rosano.

Weniger had the mortgage presentation package sent to the Bank on June 28, 1973 (Plaintiff's Exhibits 19 and 19a) in an effort to get it to participate in the financing. This promotion package was apparently mailed to other lending institutions as well, such as the County Federal Savings and Loan Association of Rockville Centre, New York. (Plaintiff's Exhibit 40)

The package, more than 60 pages in length, contained a comprehensive series of materials. These consisted of a résumé of the purpose of the financing; a copy of the loan commitment from The First Wisconsin Mortgage Company in the amount of $4 million; personal background sheets on Newmark and Rosano; maps and a detailed description of the 28-acre parcel; financial data on Newmark and Rosano and their credit references; and an outline of the terms of sale between American European and Newmark and Rosano, together with an appraisal of the property performed by a member of Ely-Cruikshank Company, Incorporated. In a separate document included with the package was an "OUTLINE OF TERMS OF SALE," which stated that the "Price" of the property was "$15,000,000." (Plaintiff's Exhibit 19a)

All of this information combined to portray a very positive potential investment opportunity indeed. The report from Ely-Cruikshank, in particular, was most supportive of the value of the property which it appraised as being worth $15 million. Based on the excellent reputation of this firm and on the fact that the report was prepared by a professional member of the American Institute of Real Estate Appraisers, this appraisal was impressive. A copy of The First Wisconsin Mortgage Company's award of the $4 million loan to Newmark and Rosano, dated June 5, 1973 and included with the mortgage package, carried with it an exemplary sanction of approval. The rather impressive list of references submitted with the package included an officer of the plaintiff itself, "Herb Johnson [sic], Vice President."

In response to its receipt of the mortgage presentation package, one of the Bank's account officers, Mr. Herbert Johnston (JOHNSTON), prepared a real estate loan offering sheet. (Plaintiff's Exhibit 13) The purpose of this document was to supply the Bank's loan committee with information so that it could decide whether to approve the loan application in the amount of $2,000,000 on the terms requested by the loan applicants, Newmark and Rosano. (VILLAGE MALL).

During the period of time when this offering sheet was prepared, it apparently was the Bank's procedure to submit a document of this type first to Mr. James Bloor (BLOOR), a consultant to and chairman of the Real Estate and Mortgage Loan Department of the Bank, for his review. (Tr., pp. 62–64) Upon his approval, the loan offering sheet would then be presented to the Bank's loan committee for further review and final approval. (Id.)

Bloor had been "in the business of real estate lending" more than 40 years by the time he saw this particular loan offering sheet in the summer of 1973. (Tr., p. 62) A forthright witness, he interpreted some of the entries on the loan offering sheet that was prepared for the GTE site. The entry referring to the type of loan as a "Land Development Loan" was described by Bloor as being a synonym for a vacant land acquisition loan because the proceeds of the loan as applied for by Newmark and Rosano were represented to cover both the acquisition of the GTE property and the demolition of certain existing structures on the land. (Tr., p. 66)

Regarding the entry indicating the "estimated cost" as $15 million, Bloor explained:

"The estimated cost usually would involve the land cost, which would be known, and then the improvement cost, assuming a building to be erected, and the soft or indirect cost, and the total. However, in this particular instance, the estimated cost was, as I recall it, the cost of the land as was represented to us and the real estate committee." (Id.)

In that portion of the loan offering sheet labeled "Conditions Required by Committee," Bloor had handwritten this statement: "12 month maturity and examination of contract to verify purchase price of $15,000,000." (Plaintiff's Exhibit 13) With some detail, Bloor explained his purpose in requiring a copy of the purchase contract in addition to the appraisal prepared by Ely-Cruikshank:

" . . . I have learned through long and I might say bitter experience, not to make loans purely on the basis of an appraisal. There are many other elements that enter into the making of a real estate loan and an appraisal is a useful tool and should be considered, but certainly not the sole basis for making a loan. In view of the size of the transaction, *I wanted to have verification that an arm's length transaction was taking place between the buyer and the seller*, which, to me, is the best evidence of value. If someone is willing to come up and pay $15 million of their hard-earned money for a piece of real estate, to me, that is better than an appraisal."

(Tr., pp. 70–71) (emphasis added)

Subsequently, Bloor testified that he was "never" told by any one that the transaction as reflected in the January purchase agreement was not an arm's length transac-

tion. (Tr., p. 72) He further stated the following:

"Q Were you ever told that Newmark and Rosano had agreed to pay GTE $10 million for this parcel?

A Absolutely not.

Q Would you have made the loan if you had known that Newmark and Rosano were buying this property for $10 million?

A I certainly would not."

(*Id.*)

Ultimately, a copy of the $15 million purchase contract was exhibited to Bloor by the Bank's account officer, Johnston. (Plaintiff's Exhibit 12; Tr., p. 77) It appears that Weniger's firm, General Resources, conveyed this contract by letter, dated August 1, 1973, to Johnston although it is unclear, based on the text of the letter, whether the December 8, 1972 contract was also sent with it. (Plaintiff's Exhibit 20; Tr., pp. 116–17) In light of Bloor's testimony, however, I believe that he did not see the earlier contract and relied solely on the January document.

The January contract, as previously described by me, was in reality an assignment between American European, as assignor, of its right to purchase the GTE property, and Rosano and Newmark, as assignees of that right. It provided that the price of this assignment, as noted above, was $15 million. Based upon his "perusal" of this document (Tr., p. 68), Bloor later approved the loan. This approval remained in effect as two additional loan offering sheets, respectively dated August 24, 1973 and September 6, 1973 (Plaintiff's Exhibits 14 and 15), were submitted to reflect the increased amount of the loan ($3,000,000) to be made by the Bank to Newmark and Rosano. (Tr., p. 69) (The Bank ultimately became the lead lender on this mortgage.)

On October 11, 1973, Johnston, on behalf of the Bank, wrote to Newmark and Rosano to inform them that their loan application had finally been approved in the amount of $12 million. (Defendant's Exhibit E)

The title closing was held on November 8, 1973 at the New York City office of the Bank's law firm, Cole and Deitz. In attendance were: GTE represented by several of its officers; American European by its president, Remo Tinti, and by its attorney Saul Weprin, Esq.; Systems by Rosano and Newmark and their respective wives, the corporation's comptroller, and its law firm; the Bank by Johnston and its law firm; representatives of Cleve Trust Realty Investors, a loan participant; General Resources by Weniger; and representatives from three title insurance companies. (Defendant's Exhibit H)

Among the events which occurred on this occasion were the following: 1.) GTE delivered to Systems a deed to the subject property (Plaintiff's Exhibit 11; Tr., p. 57); 2.) a cashier's check, payable to GTE and drawn by the Bank, was delivered to it (Plaintiff's Exhibit 10; Tr., p. 56); 3.) a mortgage and note were entered into between Systems, as mortgagor, and the Bank, as mortgagee, in the amount of $12 million (Plaintiff's Exhibit 25, Defendant's Exhibit L); 4.) a second mortgage agreement was executed between Systems, as mortgagor, and American European, as mortgagee, in the sum of $3 million (Plaintiff's Exhibits 42 and 43); 5.) a personal guaranty was signed by Newmark assuring the performance of Systems under its mortgage with the Bank (Plaintiff's Exhibit 26); and 6.) a series of checks drawn on the Bank was disbursed. (Plaintiff's Exhibits 10 and 27)

Regarding the checks issued at this transaction, the recipients and the amounts of these checks were as follows:

| Payee | Check No. | Amount |
| --- | --- | --- |
| "G.T.E. Laboratories, Inc." | 2218150 | $8,477,455.00 |
| "Saul Weprin, as Attorney" | 2218151 | $2,000,000.00 |
| "Systems Home Improvements, Inc." | 2218152 | $271,967.95 |

| Payee | Check No. | Amount |
|---|---|---|
| "Title Guaranty Company" | 2218153 | $12,605.00 |
| "American Title Insurance Company" | 2218154 | $207,142.05 |
| "Cole & Deitz" | 2218155 | $18,255.05 |
| "Lawyers Title Insurance Corp." | 2218156 | $12,605.00 |
| Total of checks: | | $11,000,000.00 |

(*Id.*)

The most interesting aspect of the day's events was American European's presence at the closing. Although it was actually owned, operated and controlled by Newmark and Rosano and was, in fact, their nominee, it appeared thereat as a completely independent entity. As a result, Newmark and Rosano, along with their wives, appeared solely on behalf of Systems and were represented by the law firm of Weiss, Rosenthal, Heller and Schwartzman.

On the other hand, Remo Tinti appeared as the president of American European and was represented by an attorney named Saul Weprin. Like his appearance at the signing of the purchase contract in December, 1972 between American European and GTE, Tinti's entire role at the title closing was limited to his appearing and signing the appropriate documents on behalf of American European. As he testified, the total duration of his presence at the closing was "a few moments." (Tr., p. 94)

Tinti's appearance, on behalf of American European as an independent entity, was buttressed by the attendance of Saul Weprin who acted as its attorney although Tinti testified that he had not retained him. (Tr., p. 95) It was stipulated at trial by counsel for both parties that if Mr. Weprin had been called as a witness, he would testify that shortly before November 8, 1973, he was asked by either Newmark or Rosano to attend the closing as the attorney for American European. (Tr., p. 145) Evidently, the extent of his participation in the entire transaction was limited to his receipt of the $2 million check, drawn to his order by the Bank, on behalf of American European. (Tr., pp. 176–77) In fact, Newmark himself described his function at the closing as the following:

" '. . . he actually acted as a conduit for the $2 million to pass through Mr. Rosano and myself to reimburse us for the money that we laid out.' "
(Tr., p. 177)

Newmark, in a deposition taken prior to trial and read into the record, stated that this check represented " 'mortgage proceeds' " (Tr., p. 164), reflecting " 'on-site development costs, closing costs, architect's and engineering fees, legal fees, title company fees, interest on the mortgage, site development work, demolition' " among other items. (Tr., p. 165) He then explained why the $2 million check issued to Weprin "as Attorney" for American European (Plaintiff's Exhibit 27), was not directly issued to Systems, since Systems and not American European had apparently funded these initial costs for the property. He said:

" 'Answer: The $2 million went to the attorney for American European because American European laid out the million and a half dollars or its assigns, and it was the intention to recapture the one million and half dollars, and to additionally have all the rest of the money as working capital.

'Question: American European had not laid out any money, had it?

'Answer: I said and/or its assigns.

'Question: In fact, that—

'Answer: I don't think you heard what I said. I said and/or its assigns.

'Question: In fact, you and Mr. Rosano had advanced the money to GT & E that was paid down between December 8, 1972 and November 8, 1973; isn't that correct?

'Answer: That's correct, sure.

'Question: And it was all of the money?

'Answer: That's correct.

'Question: So why wasn't the check payable to you and Mr. Rosano?

\*    \*    \*    \*    \*    \*

'Answer: I can't recall the reasons why, but that's the way it was done, it was intended to reimburse us for the one million and a half dollars that we laid out and to supply working capital from that point forward to take care of this $2 million requirement that was over and above the actual purchase price.'"

(Tr., pp. 166–67)

After the closing, Newmark and Rosano quickly made arrangements with American European to have the $2 million deposited in their account. On the following day, Tinti, at the behest of Newmark, authorized Weprin by letter to turn over to Systems the $2 million. (Plaintiff's Exhibit 18; Tr., pp. 96–99) Then, during the evening of November 12, 1973, Rosano and Newmark went to Weprin's home where Weprin issued a check payable to Systems in the sum of $2 million drawn on his special account. (Plaintiff's Exhibit 28) The next day, the check was deposited in the account Systems maintained at Chase Manhattan Bank. It should be noted that Systems also had an account at the National Bank of North America.

After being deposited, the proceeds of this check were depleted within two weeks. The balance in the Systems account at Chase Manhattan on November 13, 1973, the day that the $2 million check was deposited, amounted to $20,625.50. By November 26, 1973, only $25,265.20 remained in the account. (Plaintiff's Exhibit 38; Tr., pp. 191–92)

Photocopies of those checks drawn against the Systems account at Chase Manhattan during this approximately two-week period were admitted into evidence at trial. (Plaintiff's Exhibits 33, 34, 35, 36 and 38) Totaling $1,780,000, each of these six checks was signed jointly by Newmark and Rosano on behalf of Systems, as maker. Four of the payees of these various checks were other businesses owned by them. Another check was made payable directly to Newmark. The sixth of these checks was made out to "Security National Bank," a mortgagee which had issued a loan commitment of $18 million on Village Mall at Hillcrest, a project owned by them. (Plaintiff's Exhibit 19) A summary of these checks is as follows:

| Check No. | Payee | Date | Amount |
|-----------|-------|------|--------|
| 108 | "Village Mall at Hillcrest, Inc." | 11/13/73 | $950,000 |
| 109 | "Bay View Towers Apartments" | 11/13/73 | $170,000 |
| 111 | "Michael Newmark" | 11/14/73 | $100,000 |
| 112 | "Village Mall Town Houses, Inc." | 11/15/73 | $90,000 |
| 115 | "Village Mall at Hillcrest, Inc." | 11/21/73 | $20,000 |
| 119 | "Security National Bank" | 11/?/73 | $450,000 |
| | | Total | $1,780,000 |

(Plaintiff's Exhibits 33, 34, 35, 36 and 38)

---

After securing the financing, Newmark continued negotiations with the local community officials and the chairman of the City Planning Commission in an effort to obtain the rezoning of the property. (Tr., pp. 346–57; Plaintiff's Exhibits 44 and 47)

Due in part to his inability to have the property rezoned to permit the commencement of the construction project and to the dramatic increase in interest rates that occurred over this interval of time, the $12 million loan went into default. The Bank thereupon started a foreclosure action in 1975 which culminated with the sale of the property for $9 million. A proceeding to obtain a deficiency judgment against Newmark and Rosano was then initiated by the Bank in the Supreme Court, Queens County. Although this judgment was at first denied in 1978, the Appellate Division,

Second Department, reversed the lower court's decision and directed the entry of judgment in the sum of $7,374,208.05 in the Bank's favor. (Plaintiff's Exhibit 1)

In this action, the Bank contends that the debtor, Newmark, obtained a loan in the sum of $12 million from the Bank through the use of fraud and that therefore the debt representing the amount remaining to be paid on the deficiency judgment acquired by the Bank based on the loan is nondischargeable as provided by the Code.

The debtor, on the other hand, claims that as no fraud was perpetrated by the debtor in the acquisition of the loan from the Bank, this debt is dischargeable.

Both sides concede that the provision of the Code applicable to the present matter is Section 523(a)(2)(A), 11 U.S.C. § 523(a)(2)(A). This statute provides:

"(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. . . ."

Described as an "evolutionary product," 3 Collier on Bankruptcy ¶ 523.01, p. 523–6 (15th ed. 1981), Section 523(a)(2)(A) is recognized as the "successor" of Section 17(a)(2) of the Bankruptcy Act of 1898, 11 U.S.C. § 35(a)(2) (repealed 1978), *In re Green*, 5 B.R. 247, 249, 2 C.B.C.2d 905 (Bkrtcy.N.D.Ga.1980), and is "modified only slightly" from its predecessor. S.Rep.No. 989, 95th Cong., 2d Sess. 78, *reprinted in*, [1978] U.S.Code Cong. & Ad.News 5787, 5864; *see also In re Talbot*, 16 B.R. 50, 53 (Bkrtcy.M.D.La.1981); *In re Gessler*, 11 B.R. 489, 491, 4 C.B.C.2d 485 (Bkrtcy.W.D. Wis.1981). As a result, case law that has construed Section 17(a)(2) is "entirely applicable" to Section 523(a)(2)(A) of the Code. *In re Magnusson*, 14 B.R. 662, 667 (Bkrtcy. N.D.N.Y.1981).

Ordinarily, an individual debtor who files a voluntary petition for relief under Chapter 7 of the Code is entitled to a discharge of his or her debts as provided in Section 727 of the Code, 11 U.S.C. § 727. Section 523, however, enumerates those debts that are excepted from discharge under Section 727.

Over the years, a certain tension has developed between two basically disparate tenets of our nation's bankruptcy law. One aim of this law is to facilitate the debtor's economic rehabilitation by affording him or her a "fresh start" in life. The other objective concerns the prevention of the dishonest debtor's attempt to use the law's protections to shield his or her wrongdoing.

Ultimately, however, the bankruptcy law "favors the debtor who invokes its protection." *In re Arden*, 2 B.C.D. 204, 207 (Bkrtcy.D.R.I.1975) (quoting *In re Schmelzer*, 350 F.Supp. 429, 435 (S.D.Ohio 1972), aff'd, 480 F.2d 1074 (6th Cir. 1973)). The fresh start policy has been repeatedly articulated by the Supreme Court, perhaps most eloquently in the following statement by Mr. Justice Sutherland:

"[The purpose of the bankruptcy law is to] 'relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes'. . . . The various provisions of the bankruptcy act were adopted in the light of that view and are to be construed when reasonably possible in harmony with it so as to effectuate the general purpose and policy of the act." *Local Loan Co. v. Hunt*, 292 U.S. 234, 244–45, 54 S.Ct. 695 [699], 78 L.Ed. 1230 (1934); *see also Perez v. Campbell*, 402 U.S. 637, 648, 91 S.Ct. 1704 [1710], 29 L.Ed.2d 233 (1971); *Lines v. Frederick*, 400 U.S. 18, 19, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970); *Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287 [289], 59 L.Ed. 17 (1915); *Williams v. United States Fidelity & Guaranty Co.*, 236 U.S. 549, 554–55, 35 S.Ct. 289 [290], 59 L.Ed. 713 (1915).

In their interpretation of this policy, the lower courts have reached a general consen-

sus that exceptions to the dischargeability of debts should be strictly construed *against* the creditor's objections to the dischargeability of its debts. *See, e.g., In re Danns,* 558 F.2d 114, 116 (2d Cir. 1977); *In re Taylor,* 514 F.2d 1370, 1373 (9th·Cir. 1975); *Sweet v. Ritter Finance Co.,* 263 F.Supp. 540, 543 (W.D.Va.1967); *In re Lo Bosco,* 14 B.R. 739, 741, Bankr.L.Rep. (CCH) ¶ 68,420, p. 79,964 (Bkrtcy.E.D.N.Y.1981); *In re Magnusson,* 14 B.R. at 667; *In re Stewart,* 10 B.R. 214, 216, 4 C.B.C.2d 387 (Bkrtcy.C.D. Calif.1981); *In re Paley,* 8 B.R. 466, 468, 3 C.B.C.2d 648, Bankr.L.Rep. (CCH) ¶ 67,789, p. 78,502 (Bkrtcy.E.D.N.Y.1981); *In re Zangrilli,* 1 B.R. 717, 718, Bankr.L.Rep. (CCH) ¶ 67,296, p. 77,517 (Bkrtcy.D.R.I.1979); *In re Huff,* 1 B.R. 354, 356–57, 1 C.B.C.2d 171, Bankr.L.Rep. (CCH) ¶ 67,269, p. 77,489 (Bkrtcy.N.D.Utah 1979); *In re Mower,* 1 B.C.D. 378, 380 (Bkrtcy.E.D.Va.1974).

■ Although Section 523 has no provisions allocating the burden of proof, the courts uniformly impose this burden on the creditor challenging the dischargeability of a debt, pursuant to Bankruptcy Rule 407 and in apparent response to the intonations of the fresh start policy. *See, e.g. In re Singh,* 16 B.R. 449, 453 (Bkrtcy.N.D.Ohio 1982); *In re Wise,* 6 B.R. 867, 869, 7 B.C.D. 131, Bankr.L.Rep. (CCH) ¶ 67,778, p. 78,477 (Bkrtcy.M.D.Fla.1980); *In re Schlickmann,* 6 B.R. 281, 282 (Bkrtcy.D.Mass.1980); *In re Green,* 5 B.R. at 250; *In re Zangrilli,* 1 B.R. at 718; *In re Clark,* 1 B.R. 614, 616 (Bkrtcy. M.D.Fla.1979); *In re Huff,* 1 B.R. at 355–56; *In re Milbank,* 1 B.R. 150, 154, 5 B.C.D. 959 (Bkrtcy.S.D.N.Y.1979); *In re Mower,* 1 B.C.D. at 380. It has also become "well established" that the standard of proof imposed on the creditor is that of clear and convincing evidence. *In re Neumann,* 13 B.R. 128, 130 (Bkrtcy.E.D.Wis.1981); *see also In re Magnusson,* 14 B.R. at 667, *In re Guilmette,* 12 B.R. 799, 802 (Bkrtcy.D.R.I. 1981); *In re Trewyn,* 12 B.R. 543, 545–46 (Bkrtcy.W.D.Wis.1981); *In re Stone,* 11 B.R. 209, 211 (Bkrtcy.D.S.C.1981); *In re Smith,* 2 B.R. 276, 278, 5 B.C.D. 1265 (Bkrtcy.E.D.Va.1980); *In re Tomeo,* 1 B.R. 673, 677 (Bkrtcy.E.D.Pa.1979); *In re Huff,* 1 B.R. at 357; *In re Arden,* 2 B.C.D. at 206;

*In re Barlick,* 1 B.C.D. 412, 418 (Bkrtcy.D.R. I.1974).

The plaintiff-creditor's task under these circumstances is "obviously formidable." *In re Smith,* 2 B.R. at 278. A court, nevertheless, may not be unreasonable. As one court explained:

"We recognize that exceptions to dischargeability are to be strictly construed. (citation omitted) A canon of interpretation adjuring strictness is not, however, a justification for abandoning good sense." *In re Houtman,* 568 F.2d 651, 656 (9th Cir. 1978).

■ I agree with the principle that exceptions to discharge should be construed in favor of the debtor only "so far as reasonable." *In re Soika,* 365 F.Supp. 555, 556 (W.D.N.Y.1973). Once a creditor establishes a prima facie case of fraud under Section 523, the debtor then has the burden of going forward with its defense. *Carini v. Matera,* 592 F.2d 378, 380–81 (7th Cir. 1979). Our bankruptcy law cannot be so liberally applied in the debtor's favor as to permit the discharge of a debt which would not have existed *but for* the debtor's fraudulent conduct. The Supreme Court has remarked:

"In view of the well-known purposes of the Bankrupt Law exceptions to the operation of a discharge thereunder should be confined to those plainly expressed; and while much might be said in favor of extending these to liabilities incurred for services obtained by fraud the language of the act does not go so far." *Gleason v. Thaw,* 236 U.S. [558] at 562 [35 S.Ct. 287, 289, 59 L.Ed. 717]; *see also Brown v. Felsen,* 442 U.S. 127, 128, 99 S.Ct. 2205 [2207], 60 L.Ed.2d 767 (1979).

The actual elements that the creditor must prove to substantiate his or her burden of proof have been enumerated as follows:

"(1) [T]he debtor made the representations; (2) that at the time he knew they were false; (3) that he made them with the intention and purpose of deceiving the creditor; (4) that the creditor relied on such representations and (5) that the

creditor sustained the alleged loss and damage as the proximate result of the representations having been made."

*Sweet v. Ritter Finance Co.*, 263 F.Supp. at 543; *see also In re Taylor*, 514 F.2d at 1373.

This five-part test has earned broad acceptance and has been used "regularly" by the courts which have considered cases involving the dischargeability of a debt. *In re Tomeo*, 1 B.R. at 676; *see, e.g. In re Houtman*, 568 F.2d at 655; *In re Vickers*, 577 F.2d 683, 687 (10th Cir. 1978); *Sweet v. Ritter Finance Co.*, 263 F.Supp. at 543; *In re Herman*, 6 B.R. 352, 357 n. 14 (Bkrtcy.S. D.N.Y.1980); *In re Schlickmann*, 6 B.R. at 282; *In re Zangrilli*, 1 B.R. at 718; *In re Clark*, 1 B.R. at 616.

■ The first criterion of this five-part test requires the determination of whether there was a false representation and/or false pretense that was made by the debtor. The distinction between the two, it should be noted, is of little import. A false representation is an express misrepresentation, while a false pretense refers to an implied misrepresentation or "conduct intended to create and foster a false impression." *In re Schnore*, 13 B.R. 249, 251 (Bkrtcy.W.D.Wis. 1981). In essence, however, the courts generally "do not distinguish" between the two phrases owing to the conceptual difficulty attending such a fine differentiation. *See In re Schnore*, 13 B.R. at 252; *In re Pommerer*, 10 B.R. 935, 939, 4 C.B.C.2d 766 (Bkrtcy.D.Minn.1981).

The type of fraud contemplated by this section and the rationale underlying it was construed by the Supreme Court to be:

"... positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, as does embezzlement; and not implied fraud, or fraud in law, which may exist without the imputation of bad faith or immorality. Such a construction of the statute is consonant with equity, and consistent with the object and intention of Congress in enacting a general law by which the honest citizen may be relieved from the burden of hopeless insolvency. A different construction would be incon-

sistent with the liberal spirit which pervades the entire bankrupt system." *Neal v. Clark*, 95 U.S. 704, 709, 24 L.Ed. 86 [586] (1877); 3 Collier on Bankruptcy ¶ 523.08[5], p. 523–48 (15th ed. 1981) ("... 523(a)(2)(A) was intended to codify case law as expressed in *Neal v. Clark* ....")

■ What in fact constitutes fraud "has been developed by case law." *In re Mower*, 1 B.C.D. at 380. Although it has been noted that to be "false" or "fraudulent" within the meaning of Section 523(a)(2)(A) more than mere error must be involved, *In re Vickers*, 577 F.2d at 687, fraud may nevertheless be inferred from conduct. *In re Pommerer*, 10 B.R. at 939. As one court wrote:

"Implied fraud rather than being identical with constructive fraud is a species of actual fraud. Actual fraud may consist in either express or implied misrepresentations. [Express] fraud consists in deception practiced through representations. Implied fraud consists in deception practiced through representations implied from conduct as distinguished from representations expressly made." *Stern v. National City Co.*, 25 F.Supp. 948, 957 (D.Minn.1938)

■ In the case at hand, the Bank alleges that the misrepresentation committed by the debtor consisted of his concealment of the fact that American European was a nominee corporation of himself and Rosano and that the sale between it and them was merely a sale between themselves as both buyer and seller. In furtherance of this "tangled web" of deception, they directed the cameo appearances of Remo Tinti and Saul Weprin at the closing to represent American European and to create the illusion that it was an entity separate and apart from the control of him and Rosano.

Newmark himself admitted at trial that Weprin's function at the closing was to be a mere "conduit" to receive the $2 million check from the Bank. (Tr., p. 177) Not surprisingly, he and Rosano deposited the check which they received from Weprin in System's account at Chase Manhattan, not

in its account with the Bank. Providing the foundation for this subterfuge, was the January 2, 1973 agreement which was drawn up and entitled "Purchase Agreement." This was in turn submitted to the Bank in response to its request to examine the purchase contract to "verify [the] purchase price of $15,000,000." (Plaintiff's Exhibit 13)

It is interesting to note that this document, numbering 14 pages in length, was at most a mere assignment. In contrast to this assignment, Newmark and Rosano later had drawn up a subsequent assignment between themselves as American European to themselves as Systems of all rights under the GTE contract. (Plaintiff's Exhibit 16) The entire length of this assignment was only one-half of a page. Another document, entitled "Assignment" and dated July 2, 1973, by which Newmark and Rosano assigned their rights under the original purchase agreement to Systems was also only one-half page in length. (Plaintiff's Exhibit 41) These later documents illustrate just how unnecessarily elaborate the first document was. I conclude that this former document was devised to simulate an actual purchase agreement or real estate contract and to underscore the fact that it was not a mere, simple assignment between their nominee and themselves.

I also reject the explanation proffered by Newmark that the arrangement, providing that American European serve as the purchaser of the GTE property instead of him and Rosano, was intended to shield their identity from the community and to enable them to form a partnership with an elevated investment base of $15 million in lieu of the actual price of $10 million. (Tr., pp. 346–47)

Newmark testified that he had incurred the displeasure of the local community as the result of his involvement in having the area rezoned for the Bayview Towers Apartment complex which he constructed with Rosano. This displeasure apparently extended to "several other communities, as well." (*Id.*)

However, he also testified that he had personally initiated discussions with members of the local community boards regarding the possibility of obtaining the rezoning of the GTE property before the December 8, 1972 agreement was entered into. (Tr., pp. 349–54) In addition, even after having acquired the financing from the Bank, Newmark clearly identified himself to the chairman of the City Planning Commission in an effort to have the GTE site designated a *"special Zoning district"* for residential use in two letters dated respectively November 21, 1973 and December 5, 1973. (Plaintiff's Exhibits 44 and 47) It would logically seem that he would have pursued these vital rezoning discussions in the guise of American European with the assistance of Tinti in order to avoid incurring the displeasure of the local community and officials on this project, pursuant to his explanation. Yet, for his own reasons and notwithstanding this explanation which he offered at trial, Newmark shunned the shield of American European at this crucial time.

Although Newmark's other stated purpose for involving American European, that is, to generate a larger investment base for a prospective partnership, appears to be a more credible explanation of its role in the sales transaction, such a device cannot equitably justify the deluding of the principal creditor responsible for providing the very funds to effectuate the investment opportunity. As will be discussed later, a borrower has a duty to divulge all material facts to the lender and certainly the identity between Newmark and Rosano and American European was such a material fact.

Had the transaction involving American European been a genuine "flip" contract arrangement whereby the intermediary buyer was truly an independent entity, then the sale of the GTE property between American European and Newmark and Rosano would have been an actual "arm's length transaction" and thus unassailable by the Bank. The opposite, however, was the case here. Based on the complete identity between American European and Newmark and Rosano, this transaction was a deal between a buyer and seller which were

the same entity, which consequently accounts for the considerable price increase of $5 million over the original purchase price of $10 million.

Although fraud is "never presumed," *In re Keck*, 3 B.R. 517, 519 (Bkrtcy.E.D.Tenn. 1980), the courts have been willing to infer an actionable misrepresentation under Section 523(a)(2)(A) from a debtor's conduct, in the absence of written evidence. *In re Schnore*, 13 B.R. at 252. They have consequently held that silence, *In re Thomas*, 12 B.R. 765, 768, Bankr.L.Rep. (CCH) ¶ 68,228, p. 79,367 (Bkrtcy.N.D.Ga.1981), or concealment of a material fact "can be as effective a misrepresentation as an outright lie." *In re Pommerer*, 10 B.R. at 939; *see also Lloyd v. Industrial Bank of Commerce*, 241 F.2d 924 (2d Cir. 1957); *In re Neumann*, 13 B.R. at 130; *In re Quintana*, 4 B.R. 508, 510 (Bkrtcy.S.D.Fla.1980); *In re Neinhuis*, 1 B.C.D. 404, 406 (B.C.S.D.Mich.1974). As one court noted, "A debtor's silence may amount to a materially false representation prohibiting discharge of the indebtedness." *In re Thomas*, 12 B.R. at 768. In this regard, the courts thus recognize that it is "not essential that the bankrupt's pretenses be expressed in words." *In re Milbank*, 1 B.R. at 154; *see also In re Stewart*, 10 B.R. at 217; *In re Miller*, 5 B.R. 424, 427, 2 C.B.C.2d 849 (Bkrtcy.W.D.La.1980). Another court explained, "While it is impossible to probe the inner processes of a borrower's mind in order to determine his intent, his actions speak louder than his words." *In re Clark*, 1 B.R. at 617.

As discussed above, the alleged fraud involved in our case was Newmark's concealment of the fact from the Bank that American European was a mere puppet corporation under his and Rosano's immediate control. Newmark explained that the presence of American European in the transaction was to inflate the amount of purchase price. This ruse, however, caused the Bank to grant Newmark and Rosano a mortgage based on the $15 million price in the belief that the transaction was an arm's length deal.

The Second Circuit has observed:

"There is no question but that one party to a business transaction is under a duty to disclose to the other such additional matters known to him in order to prevent his partial statement of the facts from being misleading." *Peerless Mills, Inc. v. American Telephone and Telegraph Co.*, 527 F.2d 445, 449 (2d Cir. 1975).

Based on his concealment of his relationship with American European, Newmark clearly failed to meet this duty of disclosure which he owed to the Bank arising from his transactions with it.

In a case decided recently involving a similar attempt to conceal the true nature of an investment venture that arose in a bankruptcy context, the court ruled that the debtor's concealment was fraudulent as to the investors. *In re Harris*, 458 F.Supp. 238 (D.Or.), aff'd 587 F.2d 451 (9th Cir. 1978), *cert. denied*, 442 U.S. 918, 99 S.Ct. 2840, 61 L.Ed.2d 285 (1979). The debtor in *Harris* had been engaged in several businesses, one of which specialized in tax sheltered investments for high-income taxpayers. As the sole stockholder and president of this corporation, he in turn organized partnerships to buy real property in order to incur paper losses through accelerated depreciation and pre-paid interest charges.

At one point, the debtor reached an agreement with the owner of an apartment complex to purchase the property for $907,-500. Funding for the purchase was derived from a partnership organized by the debtor in which he served as the managing partner. The debtor, however, on the behalf of this partnership signed a land sale contract to purchase the apartment complex for $1,010,000. In a separate agreement which the debtor concealed from his fellow partners, the seller of the property agreed to give the debtor's private corporation a broker's commission of $100,000 and an escrow fee of $2,500. The seller also agreed to convey to this corporation the vendor's interest in the sales contract. Thus, the debtor by this agreement hid from his partners the fact that his company was getting $102,500 out of the sales transaction, together with the vendor's interest in the purchase contract.

After the partnership fell behind in its monthly payments under the sales agreement, the partners then learned for the first time that the debtor's company owned the vendor's interest and had reaped more than $100,000 on the transaction. The partners thereupon filed a state court action to require the debtor to account to the partnership and to hold title to the property in trust for them. Although the partners obtained judgment in their favor on both grounds, the debtor did not pay the money judgment and he subsequently filed a voluntary petition in bankruptcy.

In overruling the bankruptcy court's decision declining to find that the venture constituted a fraud upon the investors, the district court held that the plaintiffs were defrauded by the debtor within the meaning of Section 17(a)(2) as a result of the debtor's concealment of the role his corporation played in the transaction. *In re Harris*, 458 F.Supp. at 242–45.

The analogy between the facts of *Harris* and those of our case is quite obvious. I find that Newmark's concealment from the Bank of the inter-relationship between himself and American European through the utilization of the personages of Tinti and Weprin constituted fraud clearly within the meaning of Section 523(a)(2)(A).

The next issue which this court must address under the five-part test discussed previously is whether the debtor *knew* that the representation was false at the time it was made.

Newmark testified that he was fully aware of the role of American European as an intermediary buyer in the sales transaction with GTE and that in essence the transaction was one between his nominee, American European, and himself. (Tr., p. 345) He also stated that American European's president was under his direct control. *Id.* Nevertheless, he made no effort to inform the Bank of the relation between himself and American European. Instead, the January agreement executed between American European and Rosano and him (Plaintiff's Exhibit 12) was forwarded to the Bank by their agent Sidney Weniger to show that an apparent arm's length transaction had occurred.

■ First, in assessing the debtor's awareness or knowledge to determine liability for fraud, the courts will scrutinize the acumen and experience of the debtor. *See, e.g., In re Garman*, 643 F.2d 1252, 1257 (7th Cir. 1980); *In re Smith*, 2 B.R. at 278. It is clear in our case that we are not dealing with an unsophisticated debtor in the person of Newmark. He is an accomplished builder who had successfully obtained financing for his previous projects.

■ Second, the fact that it was Sidney Weniger, Newmark's mortgage broker, and not Newmark personally who sent the January agreement between Newmark and Rosano and American European to the Bank, does not affect Newmark's knowledge of and responsibility for the ruse. Weniger, in this capacity, was Newmark's agent. In addition, it has long been held that "[a]n agency may be implied where the principal recognizes and acquiesces in an act done by an agent." *In re Brown*, 412 F.Supp. 1066, 1071 (W.D.Okl.1975). And, as Collier states, "A debtor who has made no false representation himself may, nevertheless, be bound by the fraud of an agent acting within the scope of his authority." 3 Collier on Bankruptcy ¶ 523.08[4], p. 523–46; *see also In re Maloof*, 2 F.2d 373, 374 (N.D. Ga., E.D.1924). Indeed, it is a "universally accepted rule" that "a principal is liable for the frauds and misrepresentations of his agent within the scope of his authority or employment even though he had no knowledge of such representations." *Amen v. Black*, 234 F.2d 12, 20 (10th Cir. 1956).

In our case, Newmark contacted Weniger to enlist his services in acquiring financing for the purchase of the GTE property. Weniger accepted the employment for which he was paid $120,000 as a commission by Newmark and Rosano. (Tr., p. 132) He prepared a mortgage presentation package which was sent out to various lending institutions on their behalf. This package made no mention of the identity between American European and Newmark and Rosano.

Furthermore, in response to the Bank's request, Weniger forwarded a copy of the January agreement to the Bank. Again, no mention was made of the relationship between Newmark and American European.

It is, for the purposes of showing liability under Section 523(a)(2)(A), irrelevant whether or not Weniger knew the true nature of the sales transaction. Newmark's knowledge thereof as demonstrated by his testimony and his failure to inform the Bank of the identity between his nominee and himself, are the factors pertinent to the issue of determining the debtor's knowledge of the misrepresentation.

■ The next issue concerns whether Newmark *intended* to deceive the plaintiff. Beyond mere knowledge, the debtor must be shown to have had a "fraudulent intent or reckless disregard for the truth tantamont to wilful misrepresentation." *Wright v. Lubinko*, 515 F.2d 260, 263 (9th Cir. 1975).

Intent has been defined as "the design, resolve, or determination with which a person acts." *In re Dye*, 330 F.Supp. 895, 898 (W.D.La.1971). Although intent is not presumed, *In re Shortt*, 16 B.R. 813, 815 (Bkrtcy.W.D.Va.1982), the courts will infer intent from a "totality of the circumstances." *In re Lo Bosco*, 14 B.R. at 742; *In re Schlickmann*, 6 B.R. at 282; *In re Clark*, 1 B.R. at 617; *see also In re Shortt, supra.* This willingness stems from the' fact that "[d]irect proof of fraudulent intent is rarely available." *In re Schlickmann*, 6 B.R. at 282.

It "strains the evidence" in our case for me to hold that Newmark did not intend to deceive the Bank. *In re Clancy*, 279 F.Supp. 820, 822 (D.Colo.1968), *aff'd*, 408 F.2d 899 (10th Cir.), *cert. denied*, 396 U.S. 958, 90 S.Ct. 430, 24 L.Ed.2d 422 (1969). Notwithstanding his duty to disclose, he failed to inform the Bank of the relationship between himself and American European. Rather, the presence of Tinti and Weprin at the closing, as well as the January "Purchase Agreement," contributed to the successful concealment of the true aspect of the transaction between American European and Newmark from the Bank.

The fourth issue involves the determination of whether the Bank *relied* on the representation made by the debtor Newmark and whether such reliance was reasonable. *See, e.g., In re Shepherd*, 13 B.R. 367, 370, 372 (Bkrtcy.S.D.Ohio, W.D.1981), *In re Guilmette*, 12 B.R. 799, 802 (Bkrtcy.); *In re Trewyn*, 12 B.R. at 546; *In re Richards*, 7 B.R. 711, 714 (Bkrtcy.S.D.Fla.1980); *In re Wise*, 6 B.R. at 869. One court explained the significance of this issue in the following:

> "Since all of the elements must be sustained, (citation omitted), a bankrupt may give a materially false financial statement in writing, know it is false and intent [*sic*] out-and-out to deceive, yet if the creditor did not rely upon the statement, the debt is still discharged." *In re Smith*, 2 B.R. at 279; *see also In re Zangrilli*, 1 B.R. at 720.

The debtor contends that the Bank did not rely on the January "Purchase Agreement" and the $15 million purchase price stated therein. He insists that the Bank instead only relied upon the $15 million appraisal value assessed by Ely-Cruikshank of the GTE property, and that the Bank, through its agent Herbert Johnston, in effect "knew" that the real purchase price was $10 million. In support of these two contentions, he cites the testimony of Johnston.

Although by the time of the trial Johnston had died, transcripts of pre-trial depositions taken of him in preparation for two unrelated matters, one involving both Newmark and the Bank and the other involving Newmark and another lending institution, were available and parts of them were read into evidence at trial. According to his depositions, Johnston was employed by the Bank as an assistant mortgage officer during the time when Newmark and Rosano applied for and obtained the $12 million loan from the Bank for the GTE parcel. (Tr., p. 211) In this capacity, he was responsible for originating and underwriting prospective investment opportunities for the Bank and also served as a voting mem-

ber of the Bank's loan committee. (*Id.*) It was Johnston who " 'originated' " Newmark's loan proposal and shepherded it through the Bank's loan approval process. (Tr., p. 212) During the year following his role in the loan granted by the Bank to Newmark and Rosano, Johnston was discharged by the Bank. (Tr., p. 244)

Newmark states that Johnston knew of the real $10 million purchase price and that the Bank, through Johnston, relied solely on the Ely-Cruikshank appraisal. Concerning the first of these contentions, Johnston at one point in his deposition did mention that Rosano had informed him that the actual purchase price of the GTE property was $10 million during an informal conversation. He recalled:

"'Answer: I can't be specific, but what I'm saying is that—the last time I was here, I told you I hadn't gotten a price at all. And I thought a lot about that. And in the winter of '72-'73—I can't be more specific—he [Rosano] told me they [Rosano and Newmark] were buying a big piece of land in Bayside for $10 million. He didn't ask me for any loans, he didn't ask me for any funding, nothing. I can't be exact as to time. It would probably be some time maybe December of [*sic*] January, somewhere in there. They had either purchased or were purchasing a large tract of land.

'Question: Was that the only occassion [*sic*] upon which you discussed the price of this parcel of land with Mr. Rosano?

'Answer: Yes.

'Question: Did you ever—

'Answer: I didn't discuss it, really. I met him at a—I believe I met him at a builders function or real estate function, and just general discussion. You talk to people like a broker, dealing and saying, "Hi. How are you doing? What's new," so on and so forth.' "

(Tr., pp. 214–15)

Newmark's second contention was that Johnston claimed that, pursuant to his procedure for evaluating real estate acquisition loans for the Bank, he had requested to review an independent appraisal of the GTE site, " 'simply because the appraisal is the way all loans are made.' " (Tr., p. 214) Johnston explained: " 'I must have made 150 loans while I was there and every one is based on appraised value.' " (*Id.*) At a later point in his deposition, Johnston reiterated, " 'But I repeat that all—all mortgages that I ever made are made on the appraised value.' " (Tr., p. 218; *see also* pp. 219, 227, 259)

Based on the evidence admitted at trial and other statements made by Johnston in his deposition, I find his testimony concerning his reliance on the Ely-Cruikshank appraisal to be at best of doubtful veracity, and at worst not worthy of serious belief.

First, Johnston's reliability as a witness in general, as demonstrated through much of his testimony, is very suspect. For example, at one point he asserted that he " 'never knew' " that the purchase price of the GTE parcel as represented by Newmark and Rosano was $15 million. (Tr., p. 230; *see also* p. 253) Yet, in the mortgage presentation package that Weniger had sent directly to him and upon which Johnston presumably relied for his information about the site, there is a specific statement that the property's price was $15 million. (Plaintiff's Exhibit 19a) Weniger subsequently forwarded to Johnston a copy of a cover letter which he sent to the Chairman of the Board at County Federal Savings and Loan which apparently conveyed the same mortgage promotion package. In this letter, which Johnston admitted receiving (Tr., p. 234), Weniger stated: "Please be advised that the basis of our submission involves a purchase price of $15,000,-000 . . . ." (Plaintiff's Exhibit 40) Furthermore, Weniger also sent to Johnston on August 1, 1973 a copy of the $15 million purchase agreement which Johnston later exhibited to Bloor. (Plaintiff's Exhibit 20) Finally, in a pre-trial deposition in which the Bank was not a participant, Johnston made the following statement concerning the GTE property:

" 'It was a Government services building on it, which would have to be demolished and I was told what the cost would

be. It would be a $15 million purchase price, to the best of my knowledge . . . .' " (Tr., pp. 267–68)

The inconsistency between this statement and the ones he made in the other deposition is obvious, as well as the general inconsistency that pervades his testimony on this matter. In addition, it is difficult to believe that Johnston, as the chief officer at the Bank who was responsible for this loan, was " '[n]ot particularly' " interested in knowing the purchase price at any point during his participation in the loan's approval process. (Tr., p. 226)

Second, in light of the above finding that Johnston did apparently know of the $15 million purchase price, his testimony regarding his myopic reliance on solely the Ely-Cruikshank appraisal is similarly suspect.

Assuming that Johnston had this knowledge of the $15 million price, it therefore can not be concluded that he strictly limited his reliance on the appraised value. For instance, in each of the three loan fact sheets which he prepared for the Bank's loan committee, he indicated that the "estimated cost" of the property was $15 million. (Plaintiff's Exhibits 13, 14 and 15) It should be noted that these sheets contained separate provisions for listing the appraised value of the property. Johnston, however, claimed that he used the appraised value of $15 million for both figures. (Tr., pp. 220–21, 239) I feel the obvious difference between these two categories refutes this claim.

Third, I also reject the debtor's contention that Johnston knew that the actual purchase price of the property was $10 million and that such knowledge can properly be imputed to the Bank.

At trial, the following discourse was read into the record:

" 'Question: Mr. Johnston, you are aware, are you not, that the amount of this loan was $12 million?

'Answer: Right.

'Question: Under those circumstances, how did you make a loan for $12 million when you believed the purchase price to be 10?

'Answer: I didn't believe the purchase price to be 10. I believed the appraised value to be 15. And I make my loans on the appraised value.

'Question: You said that already. I thought you also testified, just a moment ago, that you would only make a loan of two-thirds of the purchase price.

'Answer: Well, I withdraw that statement.

*    *    *    *    *    *

'Question: But is it your testimony that you did not know what the purchase price was at the time you brought this loan to the committee?

'Answer: I would say that I didn't at the time give it careful thought, based on what had happened several months previous.' "

(Tr., p. 219, l. 8—p. 220, l. 9)

Although Johnston admitted that Rosano had told him that the real purchase price was $10 million (Tr., pp. 214–15), he consistently declared that at the time he worked on the loan proposal for the GTE site he was unaware of this fact. (See, e.g., Tr., pp. 240, 243, 254) His general explanation was that it apparently struck him after the loan was approved that the real purchase price was only $10 million. In fact, at one point he stated that he would have investigated further if he had known of that price.

■ Assuming that Rosano, during the winter of 1972–73, did informally tell Johnston that he was considering the purchase of the GTE property for $10 million, there is no basis in law to impute this knowledge to the Bank. Under the law of agency as recognized in New York and as generally interpreted by our legal commentators, an agent's knowledge will not be imputed to the principal if it was not present in the agent's mind at the time the agent effects a transaction on the behalf of the principal. As the Second Circuit held:

"A principal is not charged with his agent's knowledge obtained before he became an agent (or before he acted in the

transaction), unless the information was in the agent's mind when he acted for the principal on the occasion under scrutiny." *Phelan v. Middle States Oil Corp.*, 210 F.2d 360, 365–66 (2d Cir. 1954); *see also The Distilled Spirits*, 78 U.S. [11 Wall.] 356, 366–67, 20 L.Ed. 167 (1870).

It should be noted that the informality of the source of information conveyed to the agent is not at issue here. *See, e.g.* 3 C.J.S. *Agency* § 435 p. 301 (1973) ("Notice to an agent in order to be notice to the principal must relate to facts so material to the purpose of the agency as to make it the agent's duty to communicate the notice to his principal. The rule is not applicable even though the agent's knowledge of the facts comes to him by informal means....") Also, if the information was obtained outside the scope of the agency, some authorities will still impute this knowledge to the principal. *See, e.g.*, 3 C.J.S. *Agency* § 436, p. 304 (1973).

Yet, regardless of which rule is applied, it is generally held that such knowledge must be "clearly shown" to have been "actually present" in the agent's mind at the time of the transaction in question. 3 C.J.S. *Agency* § 445, p. 316 (1973); *see also* W.E. Sell, *Agency* 75 (1975); W. Seavey, *Law of Agency* 175 (1964).

Based on the testimony presented before me, no such clear showing was made by the defendant. I thus cannot find any ground to impute this prior knowledge Johnston acquired of the real purchase price to the Bank.

In his testimony, Bloor, the former chairman of the Bank's real estate and mortgage loan department, unhesitatingly stated that he needed "verification that an *arm's length transaction*" had taken place between the buyer, Newmark, and seller, American European. (Tr., p. 70) (emphasis added) This requirement he characterized as the "best evidence of value." (*Id.* at p. 71) Bloor later said at trial that he was never told that this was not an arm's length transaction. (*Id.* at p. 72) He further stated that he "certainly would not" have approved the loan had he known that New-

mark actually purchased the GTE property for $10 million. (*Id.*) Thus, the reliance element in this case was that the Bank relied on the debtor's representation that the transaction between American European and himself was an arm's length agreement between separate entities.

In addition to determining whether the creditor relied on the representation, the courts will look to the creditor's sophistication and contributory negligence, among other factors, to find whether its reliance was reasonable. *See, e.g., In re Arden, supra.* Therefore, where a creditor is "fully aware" of the risks it was assuming and consequently "chose to assume these risks," *In re Zangrilli*, 1 B.R. at 719, the creditor will be bound by these actions and be foreclosed from objecting to the debt's dischargeability. As one court observed, "A lender has the duty to exercise ordinary prudence in order to avoid the discharge of a debt on the grounds that the debt is for obtaining money or property by false pretenses or false representations." *In re Shepherd*, 13 B.R. at 370. In this regard, the courts have coined the term "red flag" to describe the warning which a creditor will be held to have noticed. As has been explained:

"Although in some circumstances, negligent conduct in business is excusable if committed unwittingly, it cannot be overlooked here where the complaining creditor has turned its back on an obvious red flag, and actually chosen to ignore it." *In re Arden*, 2 B.C.D. at 207; *see also In re Breen*, 13 B.R. 965, 969 (Bkrtcy.S.D. Ohio, W.D.1981); *In re Montbleau*, 13 B.R. 49, 53, 7 B.C.D. 1031, 4 C.B.C.2d 913 (Bkrtcy.D.Mass.1981).

The rationale for reading "reasonable" into the reliance factor is that "on balance" the courts are more protective of the debtor's fresh start than of the rights of creditors who have acted unreasonably. *In re Brewood*, 15 B.R. 211, 215 (Bkrtcy.D.Kan. 1981); *see also In re Arden*, 2 B.C.D. at 207. On the other hand, negligence on the part of the creditor does not automatically exonerate the debtor, even where the creditor

was "noticeably negligent." *In re Reinhart*, 1 B.C.D. 666, 667 (B.C.E.D.Va.1975).

It is not the court's duty to "second guess" a creditor's decision to make a loan or to "set loan policy" for a creditor. *In re Garman*, 643 F.2d at 1258. Thus, in an effort to construct some yardstick to measure the reasonableness of a creditor's decision to make a loan, one court has stated:

"An objective standard by which to measure 'reasonableness' requires that representations must be found to be of such a character that a reasonably prudent person would rely on them. Such a standard fosters a responsible and careful use of solicited financial statements and discourages the 'spurious use' of such statements which are obtained primarily with a view to the exception to discharge if the debtor defaults and declares bankruptcy." *In re Magnusson*, 14 B.R. at 668–69 n.1.

Unlike the situation where the creditor is fully informed of all risks and could have conducted additional research at little cost, the Bank in our case had no way to decipher the true relationship between American European and Newmark and Rosano for they were in reality one and the same. *See, e.g. In re Breen*, 13 B.R. at 969 ("[A]ll the [creditor] had to do was pick up the phone and make a call to [a certain lender] to ascertain the actual balance and the monthly payments due on the mortgage...").

Although the creditor here is a fairly large commercial bank situated in a major metropolitan area known as a center of world finance and presumably is well-versed in loan matters, *see, e.g., In re Shepherd*, 13 B.R. at 372, Newmark's resort to using American European was to shield the real purchase price and relationship between American European and himself. The effect of this artifice was to throw the creditor "off guard" and thereby prevent the Bank from discovering the true situation. *In re Brewood*, 15 B.R. at 216; *see also In re Garman*, 643 F.2d at 1259. The fact that Newmark successfully secured the loan based on the purchase price of $15 million from the Bank rather than on the true purchase price of $10 million, clearly shows that the Bank accepted and relied upon the validity of the American European/Newmark agreement as an arm's length transaction. *See, e.g., In re Gem Sleepwear Co.*, 461 F.Supp. 644, 646 (S.D.N.Y.1978) ("It has long been the law in this circuit ... that reliance need not be proved by direct testimony. The fact that a statement is made to support an application for credit and that the credit is thereafter given creates an inference of reliance."). Without any recourse other than looking to Newmark or to the representatives of American European, the Bank had no choice but to rely on the January document proffered as a "Purchase Agreement," and thus its reliance was reasonable.

It should be noted that some courts have even dispensed with the requirement of a showing of reliance altogether where the substance of the fraud is concealment by the debtor. In the *Harris* case, for example, the court stated:

"... I do not believe it was necessary for the plaintiffs to prove actual reliance here because this is a case of concealment, not affirmative misrepresentation. It is only necessary to determine whether a reasonable man would attach importance to the concealed information in determining his course of action." *In re Harris*, 458 F.Supp. at 242.

The Supreme Court, in accordance with this belief, has recognized the difficulty of proving reliance in concealment cases and has therefore held the following in a securities fraud case:

"Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456 [1472], 31 L.Ed.2d 741 (1972).

Similarly, the Second Circuit has echoed the dictates of *Affiliated Ute* and has held:

"Unlike instances of affirmative misrepresentation where it can be demonstrated that the injured party relied upon affirmative statements, in instances of total non-disclosure ... it is of course impossible to demonstrate reliance, and resort must perforce be had to materiality, i.e., whether a reasonable man would attach importance to the alleged omissions in determining his course of action.

"In cases involving non-disclosure of material facts, even when coupled with access to the information, materiality rather than reliance thus becomes the decisive element of causation. And determination of materiality allows logically an inference of reliance (citations omitted)." *Titan Group, Inc. v. Faggen*, 513 F.2d 234, 239 (2d Cir.), *cert. denied*, 423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 59 (1975).

Under the rule of law enunciated in *Affiliated Ute* and *Titan* and adhered to by the *Harris* court, the concealed matter must have been material to the creditor's decision to extend credit in order to satisfy this rule. In *Harris*, the court held that the plaintiffs therein would have attached importance to the debtor's $102,500 commission and escrow fee and to his acquisition of the vendor's interest in the sales contract.

I agree with my colleague Judge Schwartzberg of the Southern District of New York who had the occasion to discuss the issue of materiality in the following:

"It is hornbook law that the concealment of a material fact may be the equivalent of a false representation and be sufficient upon which to predicate a charge of fraud. (citation omitted) Similarly, the concealment of a fact, which if known, would have influenced a party to refrain from acting, or causing injury, has been held sufficient to constitute fraud." *In re Milbank*, 1 B.R. at 154.

A useful definition of materiality was fashioned by the Southern District more than eighty years ago:

"It is not necessary that the false representations should be the sole and exclusive consideration for the credit; but only that they were a material consideration, without which in all probability the credit would not have been given." *In re Gany*, 103 F. 930 (S.D.N.Y.1900). *Cf. Johns Hopkins University v. Hutton*, 422 F.2d 1124, 1129 (4th Cir. 1970), *cert. denied*, 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974).

It is without doubt that the fact that American European was a mere puppet of Newmark would have been considered highly material by the Bank. Instead of basing its loan on a $15 million purchase price, the Bank would then have been able to use the $10 million real purchase price as its basis for making the loan. As Herbert Johnston, stated in a deposition read into evidence at trial:

"'Question: Is that a fact, sir, you would have investigated if you had known the purchase price was $10 million?

'Answer: Probably.

'Question: Why is that?

'Answer: Because when it's a discrepancy that big, that shows you something—either somebody is underselling it or overpricing it. However, the appraised value by that company, I would have still gone along with the loan.

'Question: You would have investigated to see whether the purchase price was $10 million?

'Answer: I might have asked for another appraisal.

'Question: Would you have lent $12 million to enable Rosano and Newmark to purchase the property for $10 million?

'Answer: *Not if I was aware of the exact figure.* But as I say, I would have to look at the appraised value and if I wasn't satisfied, order a separate one on my own."

(Tr., pp. 253–54) (emphasis mine)

The final matter to be determined by this court is whether the Bank *relied to its detriment* on Newmark's concealment of the identity between himself and American European. Bloor, the Bank's chief loan officer responsible for approving the loan application, unequivocally testified that had

he known that the real purchase price was $10 million, he would not have approved the loan for $12 million. (Tr., p. 72)

The injury which the Bank suffered as a result of Newmark's concealment was that it made the loan based on what was purported to be an arm's length transaction with a $15 million purchase price and that it did not learn of this concealment until after the loan went into default. The debtor now seeks to have the entire deficiency judgment obtained against him by reason of his guaranty of the loan discharged as part of his voluntary petition for relief.

The creditor "must carry the burden of persuasion" on all five parts of the test I have enumerated to determine whether its debt, under Section 523(a)(2)(A), is non-dischargeable, *In re Tomeo*, 1 B.R. at 677; *see also In re Smith*, 2 B.R. at 279; *In re Zangrilli*, 1 B.R. at 718, and the Bank has done so in this case. I find, therefore, that the claim filed by the Bank is non-dischargeable.

The plaintiff is directed to settle a judgment to that effect on notice to the attorneys for the debtor.