In the Matter of Sharon Arlene REIN-STEIN and Howard Stephen Reinstein, Debtors.

The PEOPLE OF the STATE OF NEW YORK, Plaintiff,

v.

Sharon Arlene REINSTEIN and Howard Stephen Reinstein, Debtors-Defendants.

Bankruptcy No. 180–04025–16.
Adv. No. 180–0831.

United States Bankruptcy Court,
E.D. New York.

Sept. 12, 1983.

Robert Abrams, Atty. Gen. of N.Y., New York City, for plaintiff, Anthony R. Wannick, and Martin Finkelhor, New York City, of counsel.

Sharon Arlene Reinstein and Howard Stephen Reinstein, pro se.

MANUEL J. PRICE, Bankruptcy Judge.

This is an action by the State of New York (the "plaintiff") against Howard and Sharon Reinstein (the "debtors" or "the defendants") to have a debt allegedly owed the State declared non-dischargeable pursuant to section 523(a)(2)(A) of the Bankruptcy Reform Act of 1978 (the Code), 11 U.S.C. § 523(a)(2)(A).

The debtors filed a petition for relief under Chapter 7 of the Code, 11 U.S.C. § 101 *et seq.*, on July 14, 1980. On August 4, 1980, an order was signed by this court calling a meeting of creditors pursuant to section 341 for August 20, 1980. By that order, October 3, 1980, was fixed as the last day for filing a complaint to determine the dischargeability of a debt pursuant to section 523 of the Code.

On October 1, 1980, the plaintiff filed a complaint objecting to the dischargeability of a debt owed to the State of New York in the amount of $62,390. It was served on the defendants on October 16, 1980 and on October 31, 1981, they filed a "Motion in Opposition and Answer to Complaint" *pro se.* On January 15, 1981, an amended complaint was served on the defendants which gave them credit for a payment in the amount of $22,000, leaving a balance of $40,390.

These are the facts which were adduced at the trial:

Over a period of about three years, from early 1976 to late 1978, the debtors collected substantial amounts of money as unemployment insurance payments from the New York State Department of Labor. When certain suspicious circumstances came to the attention of agents within the Department, they commenced an investigation of the basis for the payments received by, first, Howard, and, later, Sharon Reinstein. Plaintiff's Exhibit 13, pp. 2 and 6. When the investigation was concluded, the unemployment insurance investigator in charge of the case met with a United States Postal Inspector in order to review his findings. The postal inspector then submitted the matter to the United States Attorney for the Eastern District of New York, after which a warrant was issued for the arrest of the defendants. They were arrested on December 21, 1978, in their home in Dix Hills, New York, and charged with violating sections 1341 and 1342 of title 18, U.S.C., *id.* at p. 9; Plaintiff's Exhibit 1.

The complaint charges that:

"[f]rom on or about the 1st day of January, 1976 to the date of this complaint, both dates being approximate and inclusive, within the Eastern District of New York, the defendants JOHN DOE a/k/a 'Steven Howard'; 'Alexander Sales'; 'Chaz Wallach'; Steven Tartaglia; 'Howard Reinstein'; 'Robert Valentine'; 'Stephen Baker'; and 'Allan Hornstein', and JANE DOE, a/k/a 'Rose Valentine'; 'Arleen Sales'; 'Sharon Baker'; 'Sharon Reinstein' and 'Caron Hornstein' did knowingly and wilfully devise a scheme and artifice to defraud the New York State Unemployment Insurance Fund and for the purpose of executing such scheme and artifice to defraud, the defendants JOHN DOE and JANE DOE did knowingly cause to be delivered by mail numerous New York State Unemployment checks according to the directions thereon.

"It was a part of the scheme and artifice to defraud that the defendants would appear at various local unemployment offices of the New York State Department

of Labor, on numerous occasions, and cause numerous applications to be filed under various fictitious names.

"It was further a part of the scheme and artifice to defraud that the defendants would cause numerous unemployment checks to be made payable to the various fictitious names mentioned above and then mailed to them, under those names, at various addresses within the Eastern District of New York.

"It was further a part of the scheme and artifice to defraud that the defendants would either deposit the aforesaid checks in bank accounts maintained by them in the fictitious names or present them for encashment."

The debtors each waived indictment, Plaintiff's Exhibits 2 and 3, and on April 10, 1979, Sharon Reinstein pleaded guilty before then United States District Judge George C. Pratt to one count of the many counts with which she had been charged (Plaintiff's Exhibit 2). On May 31, 1979, Judge Pratt suspended imposition of sentence and placed her on probation for two years. Plaintiff's Exhibit 4. On June 5, 1979, Howard Reinstein also pleaded guilty before Judge Pratt to one of the many counts with which he had been charged. Plaintiff's Exhibit 3.

After he entered his guilty plea, but before he was sentenced, the house in which he and his family lived in Dix Hills was sold and $22,000 of the proceeds from the sale were paid to a representative of the Unemployment Insurance Division of the New York State Department of Labor. Title to this house was held by a corporation known as S.J.A. Equity Corp., which was wholly owned by Howard Reinstein's father. *See* Tr., 10/6/82, p. 54.

On September 11, 1979, Judge Pratt suspended imposition of sentence on Howard Reinstein and placed him on probation for three years. Plaintiff's Exhibit 5.

On July 14, 1980, the debtors filed their joint petition for relief under Chapter 7. Among the debts they listed in their Schedule A–3 was a "disputed" debt to the New York State Department of Labor for $62,-390.

The Attorney General contends that the Reinsteins owe $40,390 (the amount of the overpayment less the $22,000 repaid) to the State of New York jointly and severally as a result of the debt that arose to the State from the scheme by which they received unemployment compensation payments to which they were not entitled. The State further insists that, under 11 U.S.C. § 523(a)(2)(A), this debt is non-dischargeable. The Reinsteins concede that they have received unemployment checks to which they were not entitled but they advance several defenses to this action. Their principal defense is that the payment of $22,000 made by Howard Reinstein to the New York State Department of Labor in September, 1979, was accepted by the Department as payment in full. Alternately, they maintain that, never having received persuasive verification of the amounts the State contends they owe, they do not accept the State's figures. Moreover, they insist that it is improper to hold them jointly liable for the payments received and argue that instead each of them should be liable for only those unemployment checks which they actually received.

Section 523(a)(2)(A) provides in pertinent part:

"(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—

"(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—

"(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . "

This section is recognized as being a "successor" to section 17(a)(2) of the Bankruptcy Act of 1898, former title 11 U.S.C. § 35(a)(2) (repealed in 1978), *Hennessy Cadillac, Inc. v. Green (In re Green)*, 5 B.R. 247, 249, 2 C.B.C.2d 905 (Bkrtcy.N.D.Ga.1980). "Modified only slightly" from its predecessor, S.Rep. No. 989, 95th Cong., 2d Sess. 78, *reported in,* [1978] U.S.Code Cong. & Ad-

min.News 5787, 5864, cases construing section 17(a)(2) are "entirely applicable" to section 523(a)(2)(A) of the Code, *Waterbury Community Federal Credit Union v. Magnusson (In re Magnusson)*, 14 B.R. 662, 667, 8 B.C.D. 708 (Bkrtcy.N.D.N.Y.1981).

The effect of this section is to deny a discharge for specific debts incurred by the debtor before bankruptcy. Ordinarily, an individual debtor under Chapter 7 of the Code is entitled to a discharge as provided in section 727 of the Code.

■ It is well established that, although § 523 has no provision allocating the burden of proof for actions brought under it, the creditor must establish that a debt is nondischargeable. *See, e.g., National Bank of North America v. Newmark (In re Newmark)*, 20 B.R. 842, 852 (Bkrtcy.E.D. N.Y.1982), and cases cited therein. It is equally well established that the standard of proof is "clear and convincing evidence." *Id.*

The Supreme Court, in interpreting the former Act, explained the kind of fraud that must be proven:

> ". . . positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, as does embezzlement; and not implied fraud, or fraud in law, which may exist without the imputation of bad faith or immorality. Such a construction of the statute is consonant with ... the intention of Congress in enacting a general law by which the honest citizen may be relieved from the burden of hopeless insolvency."

*Neal v. Clark,* 95 U.S. 704, 709, 24 L.Ed. 586 (1887).

What in fact constitutes the fraud contemplated by § 523(a) has been "developed by case law." *In re Mower,* 1 B.C.D. 378, 380 (Bkrtcy.E.D.Va.1974). Specifically, fraudulently obtaining unemployment insurance benefits has been held to be within the ambit of the statute, *Arizona Department of Economic Security v. Kaliff (In re Kaliff)*, 2 B.R. 465, 5 B.C.D. 1187 (Bkrtcy.D. Ariz.1979) (17(a)).

■ The next question is whether the Reinsteins engaged in the fraud as contemplated by § 523(a)(2)(A) so that their discharge of the State's debt must be denied.

During the course of a long trial the State introduced evidence in an attempt to prove, first, that unemployment checks were received fraudulently, and second, the exact amount of the checks received. Three pieces of evidence introduced during the trial were most persuasive in establishing that the Reinsteins did defraud the Department of Labor: the two transcripts of the guilty pleas entered before Judge Pratt in the Eastern District of New York, and a confession of judgment signed by Howard Reinstein. Plaintiff's Exhibit 2 is the transcript of Sharon Reinstein's appearance before Judge Pratt on April 10, 1979, at which time, assisted by counsel, she pleaded guilty to violating 18 U.S.C. § 1341, admitting that "as part of a scheme and artifice to defraud the New York State Department of Labor, obtaining money from the said department by means of false and fraudulent pretenses" she received through the mails a check made out to Sharon Baker by representing herself to be Sharon Baker when in fact she "well knew her name was not Sharon Baker." Plaintiff's Exhibit 2, pp. 13–14. *See also* Plaintiff's Exhibit 2, p. 21. Subsequently, on June 5, 1979, Howard Reinstein, assisted by counsel, pleaded guilty to violating 18 U.S.C. § 1341 and admitted that "as part of a scheme and artifice to defraud the New York State Department of Labor by obtaining money from said Department by means of false and fraudulent pretenses" he received a check made out to Alexander Sales when he knew he was not Alexander Sales. Plaintiff's Exhibit 3, pp. 12–13.

Mr. Reinstein clearly understood the implications of his pleading guilty. The record before Judge Pratt convinces me that he has defrauded the State. The following are excerpts from the transcript of his guilty plea:

"THE COURT: Mr. Reinstein, have you received a copy of the information?

"THE DEFENDANT: Yes, I have.

"THE COURT: Have you consulted with your attorney on it?

"THE DEFENDANT: Yes, I have.

"THE COURT: Are you satisfied with the representation that he has given you in this matter?

"THE DEFENDANT: Yes, I am.

"THE COURT: Have you been advised and do you understand that if you wanted to go to trial, you have certain rights, including the right to a speedy and public trial by jury, with the assistance of counsel?

"THE DEFENDANT: Yes.

\*   \*   \*   \*   \*   \*

"THE COURT: Do you also understand that you have the right to plead not guilty to this charge?

"THE DEFENDANT: Yes.

\*   \*   \*   \*   \*   \*

"THE COURT: Mr. Smith [the Assistant United States Attorney], do you represent that if we were to go to trial in this case you would have evidence which would make out a prima facie case against the defendant?

"MR. SMITH: I do.

"THE COURT: Do you believe you would be able to prove the defendant's guilt beyond a reasonable doubt?

"MR. SMITH: Yes.

"Your Honor, if I may, I would like to make certain statements to be perfectly clear on the record.

"This plea is being accepted today in full satisfaction of any and all federal charges which might arise in the Eastern District of New York from Mr. Reinstein's fraudulent use of the United States mails, starting in January 1976 and going to December 1978, in the following names, Stephen Howard, Alexander Sales, Charles Wallach, Stephen Tartaglia, Howard Reinstein, Robert Valentine, Stephen Baker and Alexander Hornstein. They are referred to in the plea agreement before your Honor, and those are the matters to which he has admitted his culpability, and I want to make sure on the record this does not cover anything

else that he has not disclosed or participated in.

"THE COURT: Now, what Mr. Smith has said, he has given us a time period, and your dealings in the Eastern District of New York, and he also said that is part of the plea agreement.

"THE DEFENDANT: Yes, sir.

"THE COURT: In other words, the participation that has been disclosed thus far covers or includes all checks in that time period which relates to the New York State Department of Labor and also as to the names which Mr. Smith itemized here.

"MR. MILONE [Reinstein's attorney]: Yes, sir.

"THE COURT: That is also your understanding, Mr. Reinstein?

"THE DEFENDANT: Yes.

"THE COURT: Mr. Reinstein, have you discussed your plea of guilty fully with your attorney?

"THE DEFENDANT: Yes, I have.

\*   \*   \*   \*   \*   \*

"THE COURT: What you're charged with, Mr. Reinstein, is a specific crime which is mail fraud under United States Code, Title 18, Section 1341, which charges that in substance you had a scheme and artifice to defraud the New York State Department of Labor by misrepresenting yourself as Alexander Sales, and as part of that scheme there was delivered to you a check in the name of Alexander Sales.

"For you to be guilty of this crime, it would have to be so that at roughly the time indicated in the information, that is March 27th of 1977, you had such a scheme with respect to the New York State Department of Labor.

"You had represented to the Labor Department to be Alexander Sales, and there was delivered by mail a letter containing a check to Alexander Sales, that you received the checks, and at that time you were aware, obviously, that you were not Alexander Sales, and essentially accepted that check as part of the overall

scheme to defraud the Labor Department.

"Those are the basic elements that have to be present if you are to be guilty of this crime.

"It would also have to be the case that at the time you were in full command of your faculties, and you knew what you were doing.

"Now, did you actually do what you are charged with?

"THE DEFENDANT: Yes.

"THE COURT: Did anyone force you to do it?

"THE DEFENDANT: No.

"THE COURT: Did you intend to do it?

"THE DEFENDANT: Yes.

"THE COURT: Did you do it knowingly and wilfully?

"THE DEFENDANT: Yes.

"THE COURT: Were you aware of what you were doing at the time?

"THE DEFENDANT: Yes.

"THE COURT: Now, would you tell me in your own words what was going on here so that I can better understand it?

"THE DEFENDANT: Your Honor, may I discuss that with my attorney before answering?

"THE COURT: Yes, certainly, take any time you need.

(Discussion off the record.)

"THE DEFENDANT: Your Honor, I made application to receive Unemployment checks, and I did in fact receive them, periodically.

"THE COURT: I take it there was a particular application in the name of Alexander Sales?

"THE DEFENDANT: Yes, there was.

"THE COURT: And you submitted that application?

"THE DEFENDANT: I appeared in the particular place and submitted that application, yes.

"THE COURT: And did you receive more than one check for Alexander Sales?

"THE DEFENDANT: Yes, I did.

"THE COURT: And you cashed the checks?

"THE DEFENDANT: Yes.

"THE COURT: I gather from what was mentioned as to the names and so forth, that you submitted other applications under a variety of names?

"THE DEFENDANT: Yes your Honor.

"THE COURT: Have you been threatened or forced by anyone into entering a plea of guilty?

"THE DEFENDANT: No."

Plaintiff's Exhibit 3, pp. 9, 10, 13–15, 16–19.

The third extremely convincing piece of evidence submitted by the State and marked as Plaintiff's Exhibit 10 is an "AFFIDAVIT OF CONFESSION OF JUDGMENT" signed by Howard Reinstein on August 22, 1979 at the request of Burton Landesman, an attorney in the Unemployment Insurance Division of the Department of Labor. Tr., 9/23/81, pp. 10–11. In this Confession of Judgment, Reinstein signed the following:

"That he ... hereby confesses judgment in this action, in favor of The Industrial Commissioner of the State of New York ... for the sum of $40,115.00, and authorizes that judgment be entered therefor against him accordingly.

"The Confession of Judgment, ... is for a debt justly due to the plaintiff arising from the following facts:

"Overpayments of Unemployment Insurance Benefits paid to the judgment debtor by the judgment creditor in [sic] amount of $4,425 and under the following aliases used by him in the following amounts: Stephen Howard, $5,800., Stephen Baker, $1,610, Alex. Sales, $6,730., Steven Tartaglia, $7,885, Robert Valentine, $3,220, Allan Hornstein, $4,140 and Chaz Wallach, $6,305, all of which he was not entitled to."

Mr. Reinstein claims that:

"I strongly objected to signing it because on the facts that after repeatedly requesting ... I asked the document substantiation of any figures that were on there and the only response I got was that I better sign it or else they're going to proceed with all the Grand Jury threats and with all the other charges."

Tr., 10/6/82, p. 11. *See also* Tr., 10/6/82, p. 40.

The fact remains, however, that at the time of signing this Confession of Judgment (which was not acted upon by the State, Tr., 9/25/81, p. 15), Reinstein was represented by counsel who, in fact, notarized his signature on the document. Plaintiff's Exhibit 10.

Although Reinstein testified in his own behalf during the trial of this matter, he never introduced any evidence rebutting the proof that he fraudulently received unemployment insurance benefits in his own name and in the various names listed in the Confession of Judgment, nor did he deny fraudulently receiving payments under those names. I am convinced therefore that in fact he did receive checks to which he was not entitled. *See also* Plaintiff's Exhibit 7 (containing an envelope addressed to Steven Tartaglia and an envelope addressed to Stephen Baker taken from the Reinsteins' home) and Exhibit 9 (containing a photocopy of a New York State Department of Labor claim booklet for Howard Reinstein, a check for a joint checking account of Stephen Baker and Sharon Baker, a savings bankbook for a joint account of Sharon and Stephen Baker, a savings bankbook for a joint account of Alexander and Arleen Sales, a savings bankbook for a joint account of Caron and Alan Hornstein, a bill for a mail and telephone listing made out to Alexander Sales and another person, two checks signed by Steven Tartaglia, and an envelope addressed to Steven Tartaglia, all taken from the Reinstein home on the day of their arrest.) *See* Tr., 9/21/81, pp. 39–40. *See also* Plaintiff's Exhibit 6, a transcript of an examination under oath of Howard Reinstein on June 29, 1979, conducted by representatives of the Unemployment Insurance Division of the Department of Labor, at which time he admitted to filing unemployment insurance claims under the names Steven Howard (p. 28), Alexander Sales (p. 29), Charles Wallach [*sic*] (p. 29), Steven Tartaglia (p. 30), Robert Valentine (p. 30), Allan Hornstein (p. 31), and further admitted that the companies he filed the claims on were fictitious and were used for the purpose of filing unemployment insurance claims (pp. 31 and 36).

The evidence summarized thus far does not prove fraudulent conduct by Mrs. Reinstein except with respect to checks received by her drawn to the order of Sharon Baker. Other evidence, however, proves her fraudulent conduct. Michael Ford, a United States Postal Inspector, Tr., 9/21/81, p. 4, testified that on December 21, 1978, he and other postal inspectors arrested the Reinsteins at their residence at Dix Hills, New York. After the arrest, Mr. Ford accompanied her to the Brooklyn Post Office, Tr., 9/21/81, p. 33. There, according to Mr. Ford:

"Mrs. Reinstein stated that she had certified for unemployment insurance under the names Rose Valentine, Arleen Sales, Sharon Baker, Sharon Reinstein and Caron Hornstein. She also stated that she had personally picked up mail at 50 Glen Street, Glen Cove, New York, 1250 Suffolk Avenue, Brentwood, New York, 20 Jerusalem Avenue, Hicksville, New York, 95 Searing Avenue, Mineola, New York and 137 North Franklin Street, Hempstead, New York."

Tr., 9/21/81, p. 34. *See also id.* at p. 35. These addresses were those to which unemployment insurance checks were mailed pursuant to the applications under the aliases Mrs. Reinstein admitted to using. *See* Plaintiff's Exhibit 13, pp. 12–13. That Mrs. Reinstein had received unemployment insurance checks under those names is corroborated to some extent by certain evidence gathered at her home on the day of her arrest. Mr. Ford claimed that at the time he arrested the Reinsteins, "[t]here were a number of documents in the house that were in open view which were seized at the time of the arrest." Tr., 9/21/81, p. 31. These documents, admitted into evidence as Plaintiff's Exhibit 7, include a note that, together with directions to do sewing chores directed to "Sharon," contains the following:

"Sign for checks under the name of Sharon Howard in Huntington—be careful—if you think they recognize you—you

worked for HSR Publishing Co., Inc. 159 West 33rd St. N.Y. 10001 Suite 1010 you earned $250 per week and you started on July 31, 1978 and got layed off on this Friday December 15, 1978."

In addition, after the arrest a search warrant was obtained to search the Reinstein residence and the search, conducted on the day of the arrest, yielded other incriminating papers. Tr., 9/21/81, p. 38. Photocopies of the material parts of those papers were admitted into evidence as Plaintiff's Exhibit 8. They include a check imprinted with the names Stephen Baker and Sharon Baker, a "Transaction" card imprinted with the name Sharon Baker, a Hicksville Public Library card imprinted with the name Sharon Baker and the address 20 Jerusalem Avenue, Hicksville, N.Y. 11801, a Social Security card belonging to "Sharon Baker," a savings bankbook showing a joint account in the names of Sharon and Stephen Baker, unemployment insurance claim booklets in the names of Sharon Baker, Rose Valentine, and Arleen Sales, a savings account booklet in the names of Alexander and Arleen Sales, and a savings account booklet in the names of Caron Hornstein and Alan Hornstein. See also Tr., 9/21/81, pp. 39–40. Other evidence against Mrs. Reinstein was supplied by a handwriting expert whose testimony was introduced by the State and who testified that the endorsements of unemployment checks drawn to the order of Sharon Reinstein, Sharon Baker, Rose Valentine, and Caron Hornstein were made by Mrs. Reinstein. See Tr., 3/22/82, p. 56; Tr., 4/21/82, pp. 81, 85, 94. See infra, pp. 897–898. Moreover, Mrs. Reinstein was receiving many of these checks at the same time: the checks for Rose Valentine introduced into evidence are dated June 19, 1978, to December 4, 1978; the checks to Caron Hornstein are dated February 1, 1978, to October 20, 1978; the checks to Arlene Sales are dated August 3, 1977, to April 25, 1978, and October 26, 1978 to November 3, 1978. All this clearly proves that Mrs. Reinstein received these checks fraudulently.

More particularly, there is no question that the checks Mrs. Reinstein received under her own name were wrongfully received. When Howard Reinstein was examined by representatives of the Unemployment Insurance Division of the New York State Department of Labor, he testified as follows:

"Q  Did Sharon Reinstein ever perform services for 8319 Corporation?

"A  I don't remember.

"Q  I show you an LO 12, Wage Verification, similar to what you looked at before, 20 weeks of employment, $4,000, February, 1975 thru February, 1976, signed by executive vice president, Steven Tartaglia, which you said you used.

"A  I signed that.

"Q  She performed services for the corporation?

"A  According to that, yes.

"Q  What did she do for the corporation? You are showing wages for an unemployment insurance claim which indicates that work was performed for a corporation. What did she do?

"A  She didn't do anything. That was the beginning of our—"

Plaintiff's Exhibit 6, pp. 15–16.

This corporation was the one under which Mrs. Reinstein claimed unemployment insurance benefits in her own name.

In his testimony in this case, Mr. Reinstein did not in any way contradict this earlier statement of his. Mrs. Reinstein chose not to testify and thus did not present any evidence to rebut the State's proof that she fraudulently received these benefits. Consequently, I am convinced that the benefits she received under her own name were fraudulently received.

## THE MAJOR DEFENSE

Although the Reinsteins do not contest the State's contention that they fraudulently received unemployment insurance benefits, they maintain that no money is owed to the State because they have settled in full the claim the State has against them. They contend that Michael Landesman, an attorney in the Office of the Deputy Industrial Commissioner for the New York State Labor Department, negotiated this settle-

ment. The alleged settlement occurred between the time Mr. Reinstein pleaded guilty to mail fraud on June 10, 1979, and the date of his sentencing, on September 11, 1979. Tr., 10/6/82, p. 12. On August 30, 1979, between those two dates, the house in which Mr. Reinstein and his family lived was sold and most of the proceeds of that sale which were not used to satisfy the mortgage or to pay back taxes, namely, $22,000, were paid to the State. The title to this house was held in the name of a corporation of which Mr. Reinstein's father was the president and sole shareholder.

At trial, Howard Reinstein insisted that "this was a payment in settlement for any and all monies that may have been owed to the State of New York for any overpayments that I had received." Tr., 10/6/82, p. 43. Although at times during the trial, when Mrs. Reinstein was not present in the courtroom, he insisted the payment was made to settle any claims the State had against *him* arising out of his unemployment insurance fraud, see *id.*, p. 74, at other times he contended that the payment was to cover the obligations of both debtors. In their Post-Trial Memorandum of Law, for example, the debtors state that "[t]he 'Debtors' defendants have paid their obligation in full to The People of the State of New York in a settlement reached on August 30, 1979 in the sum of $22,000.00." P. 1. See also pp. 6, 7, 9 and Tr., 10/30/81, p. 14.

In support of their position, the Reinsteins introduced into evidence, as Defendants' Exhibit E, a receipt, dated September 12, 1979, from the Unemployment Insurance Division of the New York State Department of Labor which acknowledged that $22,000 was received from Howard Reinstein of 7 Norman Court, Dix Hills, New York as "overpayment of claim under the following program: U.I. only." This receipt does not indicate that it was a full payment or that it was accepted as a settlement by the Labor Department for the monies owed. The debtors nevertheless insist that it was received in settlement of the State's claim against them. Reinstein attempted to buttress this contention by testi-

fying that he was not motivated to make a partial payment in the hope of obtaining a lighter sentence. He testified:

"Judge Pratt made a statement very clearly at—on June 10th when I appeared before him which is prior to the sale of the house, that regardless of what I did and in the way of making restitution, whether I did or didn't or whether it was 2,000 or 20,000, that regardless, he was going to make his determination as to my sentencing on whatever facts in evidence he had before him."

Tr., 10/6/82, p. 66.

At the same time, Mr. Reinstein admits that Judge Pratt was aware of attempts by the State to obtain repayment from Mr. Reinstein. He testified:

"Judge Pratt reserved making a decision on sentencing because the state had requested that sentencing would be adjourned so that they would have an opportunity to get whatever money they could in repayment. The judge granted the state or put it off until September to give them that opportunity."

Tr., 10/6/82, p. 12.

He further testified that the following occurred at the time of the title closing:

"[W]e started to talk about what I would offer as a settlement to New York State... [W]e went back and forth and we settled on 22,000.

\* \* \* \* \* \*

"[F]inally, I said 22,000 is all I'm going to do. I'll take my chances, if you don't want to accept that—because certain monies were needed to pay the moving truck to get my family out... Mr. Landesman said Okay, he'll accept 22,000.

\* \* \* \* \* \*

"I said, I would like to have a document in writing that says this $22,000 is being accepted, that you are accepting it for the State and that you're not—going to pursue [*sic*] criminal action and they won't pursue ... [*sic*] looking for additional money and Mr. Landesman said that he would not put anything in writing and

that I would just have to take his word for it. But, that he assured me if I . . . if he walked out without any money or that money was less than he wanted to accept, that he was going to immediately ask the State to proceed with criminal action against me."

Tr., 10/6/82, pp. 70–72.

Curiously, Mr. Reinstein's position during this adversary proceeding conflicts with an earlier representation made under penalty of perjury. On the "Statement of Financial Affairs for Debtor Not Engaged in Business," appended to the joint petition of the debtors filed on July 14, 1980, the debtors answered question 8b as follows:

"b. Have you made any assignment of your property for the benefit of your creditors, or any general settlement with your creditors, within one year immediately preceding the filing of the original petition herein?

"[Answer:] YES . . . ALL REMAINING PROCEEDS FROM THE SALE OF PROPERTY LOCATED IN DIX HILLS, N.Y. WAS GIVEN TO THE DEPT. OF LABOR IN SEPT. 79 TO *REDUCE* THE AMOUNT OF OVERPAYMENT I RECEIVED IN ERROR. TOTAL GIVEN: $22,000.00 WHICH WAS MY FATHER'S CONTRIBUTION TO KEEP ME FREE. THE PROPERTY BELONGED TO MY FATHER FOR MANY YEARS PRIOR TO MY INCURRING DEBTS." (Emphasis mine)

The statement of affairs was signed by the debtors.

Here, then, Mr. Reinstein is not claiming that his motive in paying the $22,000 was to settle the State's debt but rather that it was to keep himself out of jail. Moreover, he is not claiming that the money was to expunge the debt but rather that it was to *reduce* it—precisely the position of the plaintiff herein.

Michael Landesman, the person with whom the settlement was purportedly arranged, contradicts Reinstein's contention that the $22,000 payment was in settlement of the State's claim. He testified that he never indicated he was accepting the $22,-000 payment as a settlement, Tr., 9/23/81, p. 101, and instead maintained "I . . . made it clear to [M. Reiss] [attorney for the sellers] and I assume to you because you were present, that I did not have authority to agree to these things on behalf of the Department of Labor." *Id.*

During the trial, the following exchange took place:

"THE COURT: Were you ever told by anyone on behalf of Mr. Reinstein that the $22,000 that you received was to be in full settlement of any and all claims that the department, the Unemployment Insurance Department had against Mr. and Mrs. Reinstein? Was that ever said to you in any manner, shape or form?

"THE WITNESS [Mr. Landesman]: Definitely not, your Honor. I certainly would not have signed that document if anyone had said anything about a full settlement because I have consistently maintained my position in the 12 years that I have worked for the Labor Department that I have no authority to make a settlement."

Tr., 9/25/81, pp. 28–29.

Mr. Landesman further insisted:

"I didn't have authority to agree to accept anything in settlement because that question has come up time and again and it has been reviewed by everybody in our department. Our department does not have authority to settle cases. We don't know with whom the authority resides, if anyone, but I did have authority to say yes or no as to whether I was going to put my signature on this piece of paper obviously."

Tr., 9/23/81, p. 102.

I have observed the demeanor of the witnesses, and I believe Mr. Landesman. Not only do I unquestionably find him to be more credible than Mr. Reinstein, but I find that the surrounding circumstances do not support Mr. Reinstein's story. The record clearly shows that he is much more sophisticated than many people, and yet he would have this court believe that he, an experienced businessman, entered into a settle-

ment without obtaining a receipt stating that his payment was accepted in full settlement of all claims which the Unemployment Insurance Division had against him and his wife. I believe that he paid the $22,000 to the State in the hope of obtaining a lighter sentence from Judge Pratt and possibly avoiding further criminal prosecution and I also believe that, while he would have liked to have had a settlement with the State, no State agent agreed to it.

THE AMOUNT DUE

Having determined that Sharon and Howard Reinstein fraudulently received unemployment insurance checks, and having determined that they have no viable defense to any part of the debt over $22,000, the next question is how much each debtor owes the State. The first step in this determination is to ascertain how much money each debtor received.

The State relied primarily on three types of evidence to establish the precise amounts received by the Reinsteins. First, it relied on the Confession of Judgment signed by Howard Reinstein. Although Mr. Reinstein repeatedly protested during the course of the trial that he had signed the Confession of Judgment under duress and had never been given any verification of the figures thereon, see, e.g., Tr., 10/6/82, pp. 11, 40, he failed to produce any evidence to rebut it. Secondly, the State relied on the testimony of a handwriting expert, Felix Klein, who identified endorsements on unemployment insurance checks as being those of either Mr. or Mrs. Reinstein. Although Mr. Klein was perhaps not the most convincing expert the State could have presented, I conclude that, taking his testimony in the context of all the other evidence presented at the trial, it is reliable. Third, the State relied on records of the Department of Labor for the amounts received by the Reinsteins. In many instances, these records, in the form of computer printouts, suggest higher payments to them than are reflected in the checks. To the extent these records do show higher payments than are proven by other evidence, I do not find them to be controlling.

I will begin by finding the amount of the checks received by each of the debtors.

CHECKS RECEIVED BY HOWARD REINSTEIN

a. *Howard Reinstein*

The State introduced as evidence the following checks made out to H. Reinstein, bearing the social security number under which Howard Reinstein had applied for unemployment insurance benefits (Plaintiff's Exhibit 7):

| | | |
|---|---|---|
| 32 checks at | $115. = | $3,680 |
| 1 check at | 190. = | 190 |
| 1 check at | 230. = | 230 |
| 1 check at | 325. = | 325 |
| | | $4,425 |

Plaintiff's Exhibit 40. In his Confession of Judgment (Plaintiff's Exhibit 10), Reinstein confessed to having wrongfully received $4,425 under his own name. I conclude that he did wrongfully receive $4,425 under his own name.

b. *Steven Tartaglia*

Plaintiff introduced the following checks drawn to the order of S. Tartaglia, which bore the same social security number, 121–58–7714, as that of the "Steven Tartaglia" who had registered for unemployment insurance benefits (see Plaintiff's Exhibit 21):

| | | |
|---|---|---|
| 39 checks at | $ 95 = | $3,705 |
| 6 checks at | 190 = | 1,140 |
| | | $4,845 |

Plaintiff also introduced into evidence one check, number 08529508, made out to "S Tartoylia," which bears the same social security number as all of the checks made out to "S Tartaglia." It is endorsed "S. Tartoylia" and below that, "S. Tartaglia."

Felix Klein, the State's handwriting expert, testified that all of these checks were endorsed by Howard Reinstein. Tr., 4/21/82, p. 68. Reinstein admitted in the Confession of Judgment that he wrongfully received $7,885 under the name Stephen Tartaglia, Plaintiff's Exhibit 10, which is the amount State records show "Stephen Tartaglia" to have received. Plaintiff's Exhibit 13, Plaintiff's Exhibit 21.

Because he admitted having received $7,885, I conclude he received that figure.

#### c. *Chaz Wallach*

The State submitted as Plaintiff's Exhibit 47 the following checks drawn to the order of C Wallach, all of which were endorsed C B Wallach:

| | | |
|---|---|---|
| 1 check at | $ 95 = | $95 |
| 6 checks at | 100 = | 600 |
| 7 checks at | 115 = | 805 |
| 9 checks at | 120 = | 1,080 |
| 6 checks at | 190 = | 1,140 |
| 1 check at | 195 = | 195 |
| 8 checks at | 200 = | 1,600 |
| 1 check at | 240 | 240 |
| Total | | $5,755 |

Parenthetically, the State contended in its post-trial memorandum that it had submitted seven checks for $190 and a total of forty checks, (p. 6), but in fact there were only six checks for $190. Indeed, the record makes it clear that only thirty-nine checks drawn to C. Wallach were introduced into evidence. Tr., 4/21/83, p. 76.

Mr. Klein identified all of the C Wallach checks introduced into evidence as having been endorsed by Howard Reinstein. Tr., 4/21/82, p. 77. Reinstein admitted to having wrongfully received $6,305 under the name of Chaz Wallach in his Confession of Judgment, Plaintiff's Exhibit 10, which is the amount State records show him to have received. Plaintiff's Exhibit 13, Plaintiff's Exhibit 22.

Because Howard Reinstein admitted to having received $6,305 as Chaz Wallach, I find he received $6,305.

#### d. *Stephen Howard*

Plaintiff introduced into evidence as Plaintiff's Exhibit 44 the following checks drawn to the order of S. Howard, which were all endorsed S Howard:

| | | |
|---|---|---|
| 14 checks at | $ 95 = | $1,330 |
| 25 checks at | 100 = | 2,500 |
| 11 checks at | 125 = | 1,375 |
| 3 checks at | 115 = | 345 |
| Total | | $5,550 |

While the plaintiff contended in its post-trial memorandum that it had submitted 14 checks for $95, 25 checks for $100, and 25 checks for $125, all drawn to the order of Stephen Howard, an examination of Plaintiff's Exhibit 44 shows that it did not.

Mr. Klein identified all the checks submitted as having been endorsed by Howard Reinstein. Tr., 4/21/82, p. 61. Reinstein confessed to having wrongfully received $5,800 in checks drawn to the order of Stephen Howard. State records show "Stephen Howard" to have received $5,800. Plaintiff's Exhibit 13, Plaintiff's Exhibit 18. Because Howard Reinstein admitted to having received $5,800 as Stephen Howard, I conclude that is the amount he received.

#### e. *Robert Valentine*

The following checks drawn to the order of and bearing the Social Security number of "Robert Valentine," 111–60–8661, were introduced into evidence as Plaintiff's Exhibit 38:

| | | |
|---|---|---|
| 1 check at | $230 = | $230 |
| 26 checks at | 115 = | 2,990 |
| Total | | $3,220 |

All but two of the checks, numbers 22381587 and 23374283, were endorsed by "R Valentine." These unendorsed checks, dated May 24, 1978, and June 21, 1978, cleared Citibank as did all the other checks made to the order of R. Valentine. In addition, their "week ending" dates are seven days after and seven days before the dates on the other checks admitted and so they fill in an apparent gap in the R. Valentine checks.

Mr. Klein testified that all these checks that were endorsed were endorsed by Howard Reinstein, Tr., 3/22/82, pp. 28–29. Reinstein admitted in his Confession of Judgment to having wrongfully received $3,220 from the State.

I believe that the unendorsed checks were received and cashed by Reinstein, and I conclude that he received $3,220 under the name "Robert Valentine."

#### f. Allan Hornstein

The State introduced into evidence as Plaintiff's Exhibit 46 thirty-six checks for $115, for a total of $4,140, each drawn to the order of A. Hornstein and bearing the social security number, 083–60–8806, under which Allan Hornstein registered for unemployment insurance benefits. Plaintiff's Exhibit 46. All of these checks are endorsed by "A Hornstein" except check number 71356527, dated May 2, 1978, which bears no endorsement. All of the checks but one, number 68826568, dated March 8, 1978, bear stamps which indicate they cleared Citibank or First National City Bank. The check bearing no endorsement cleared Citibank. The date of this unendorsed check caused it to fill in what would otherwise be an unexplained gap in the checks.

Mr. Klein testified that all the endorsements were those of Howard Reinstein. Tr., 4/21/82, pp. 71, 75. He admitted to having wrongfully received $4,140 from the State under the name of Allan Hornstein in the Confession of Judgment. Given all the circumstances, I believe the unendorsed check was received and negotiated by Reinstein and I therefore believe he received a total of $4,140 under the name of "Allan Hornstein."

#### g. Stephen Baker

The State introduced as Plaintiff's Exhibit 39 fourteen checks drawn to the order of S. Baker at $115 each for a total of $1,610. These checks bore the social security number under which "Stephen Baker" had applied for unemployment insurance. Plaintiff's Exhibit 16. Thirteen of the checks were endorsed S. Baker and one, number 20604795, was endorsed Stephen Baker.

Although Mr. Klein, the State's handwriting expert, initially testified that all of the checks had been endorsed by Howard Reinstein, see, e.g., Tr., 3/22/82, pp. 54, 60, he later changed his testimony to admit that he had been mistaken and that three of the checks, numbers 69945449, 21269218, and 20756594, had in fact been endorsed by Sharon Reinstein.

Even though Sharon Reinstein, posing as Sharon Baker, see infra pp. 897–898, apparently endorsed these checks, it seems likely that they were received by Howard Reinstein, who had fraudulently applied for them, and then given to his wife who subsequently endorsed them. He admitted to having received $1,610 as Stephen Baker in the Confession of Judgment that he signed, Plaintiff's Exhibit 10, and I conclude that he received that amount, which is the total of the Stephen Baker checks.

#### h. Alexander Sales

The plaintiff introduced as Plaintiff's Exhibit 42 the following checks payable to A Sales, endorsed by "A Sales," bearing the social security number under which "Alexander Sales" applied for unemployment insurance benefits, Plaintiff's Exhibit 15:

| | | |
|---|---|---|
| 17 checks at | $ 95 = | $1,615 |
| 8 checks at | 100 = | 800 |
| 9 checks at | 115 = | 1,035 |
| 3 checks at | 190 = | 570 |
| 4 checks at | 200 = | 800 |
| 11 checks at | 120 = | 1,320 |
| 1 check at | 230 = | 230 |
| 1 check at | 240 = | 240 |
| Total | | $6,610 |

Reinstein admitted to having wrongfully received $6,730 in unemployment insurance benefits under the name of "Alexander Sales" in the Confession of Judgment he signed. Plaintiff's Exhibit 10. Mr. Klein testified that the endorsements on these checks were by Howard Reinstein. Tr., 4/21/82, pp. 43–46.

Because he admitted to having received $6,730 as Alexander Sales, I conclude that is the amount Reinstein received under this name.

### CHECKS RECEIVED BY SHARON REINSTEIN

#### a. Sharon Baker

The plaintiff introduced as Plaintiff's Exhibit 12 the following checks made payable to S. Baker:

| 26 checks at | $100 = | $2,600 |
|---|---|---|
| 13 checks at | 95 = | 1,235 |
| Total | | $3,835 |

See Tr., 9/23/81, pp. 30–32. Two of the checks are endorsed S. Baker; all the others are endorsed Sharon Baker. Tr., 9/23/81, p. 32. Mr. Klein identified the endorsements as having been made by Sharon Reinstein. Tr., 3/22/82, p. 56. I conclude therefore that she received $3,835 as "Sharon Baker."

b. *Rose Valentine*

The plaintiff introduced as Plaintiff's Exhibit 49 the following checks payable to the order of R. Valentine, bearing the social security number under which Rose Valentine applied for unemployment insurance benefits (see Plaintiff's Exhibit 25):

| 11 checks at | $120 = | $1320 |
|---|---|---|
| 12 checks at | 115 = | 1380 |
| 1 check at | 230 = | 230 |
| Total | | $2930 |

All of these checks are endorsed "R Valentine" except one, number 23747478. Mr. Klein testified that the endorsed checks had been signed by Sharon Reinstein. Tr., 4/21/82, p. 85. That check, like all the others, bears a Citibank stamp. It completes what would otherwise be a gap in the series of checks.

I therefore conclude that Sharon Reinstein received $2,930 as "Rose Valentine."

c. *Sharon Reinstein*

The plaintiff introduced the following unemployment insurance benefit checks made payable to the order of S A Reinstein:

| 15 checks at | $190 = | $2,850 |
|---|---|---|
| 24 checks at | 95 = | 2,280 |
| Total | | $5,130 |

Plaintiff's Exhibit 50. Each of these checks, except one, number 60035279, is endorsed "Sharon Reinstein," and that one is endorsed "S. Reinstein." Mr. Klein testified that all the endorsements are those of Sharon Reinstein and I therefore am convinced that Mrs. Reinstein received $5,130 in her own name.

d. *Caron Hornstein*

The plaintiff introduced the following checks made payable to the order of C Hornstein:

| 1 check at | $460 = | $ 460 |
|---|---|---|
| 35 checks at | 115 = | 4,025 |
| Total | | $4,485 |

Plaintiff's Exhibit 48. All of these checks are endorsed C Hornstein except check number 71268263, which bears no endorsement. This check bears a clearance stamp from Citibank; all the other C Hornstein checks have either "Citibank" or "First National City Bank" stamps.

Mr. Klein concluded that those C Hornstein checks that were endorsed were signed by Sharon Reinstein. Tr., 4/21/81, p. 81. Given all the evidence, I believe Mrs. Reinstein received $4,485 under the name Caron Hornstein.

e. *Arlene Sales*

The plaintiff submitted as Plaintiff's Exhibit 43 the following unemployment benefit checks payable to the order of A. Sales and bearing the social security number that Labor Department records indicate as that of "Arlene Sales" (see Plaintiff's Exhibit 27):

| 2 checks at | $200 = | $ 400 |
|---|---|---|
| 4 checks at | 125 = | 500 |
| 27 checks at | 100 = | 2,700 |
| 8 checks at | 95 = | 760 |
| Total | | $4,360 |

Parenthetically, the State in its post-trial memorandum maintains that thirty-three checks totaling $4,360 were submitted instead of forty-one checks totaling $4,360 (ss p. 11). The State is incorrect.

Each of the checks submitted is endorsed "A Sales." Although Mrs. Reinstein admitted to having received checks under the name Arlene Sales, see Tr., 9/21/81, p. 34, Mr. Klein testified that she did not endorse them, Tr., 4/21/82, p. 39, but rather that the checks were endorsed by Mr. Reinstein. Tr., 4/21/82, pp. 42–43, 44, 46.

John Sansone, an employee of the Chemical Bank at its Astoria, N.Y., branch, Tr., 4/21/82, pp. 3–4, testified that "Alexander Sales" maintained a checking account, number 027–206680, at the Astoria branch of the bank. Tr., 4/21/82, pp. 4, 13. He further testified that the "Arlene Sales" checks admitted into evidence went through the Chemical Bank because they bear the bank's stamp. Tr., 4/21/82, p. 17. Indeed, several of the checks, specifically numbers 18340705, 21030442, 21311336, 68102359, 68425774, 687498870, 69463520, 16576813, 74096032, and 74240265, bear the account number of Alexander Sales' Astoria account. *See* Tr., 4/21/82, p. 18. They total $1,245. Alexander Sales, of course, is a name under which Reinstein collected unemployment insurance benefits. *See supra,* p. 897. Nevertheless, I believe that Mrs. Reinstein should be charged with having received these checks primarily because she admitted to having received checks under the name Arlene Sales at the address shown on the checks. *See* Tr., 9/21/81, p. 34. Moreover, it is hardly likely that Reinstein could have been the person who applied for unemployment insurance benefits under the name "Arlene Sales." Given all the facts, I conclude that, as Arlene Sales, Mrs. Reinstein received unemployment benefit checks totaling $4,360.

### Conclusion

To summarize the above, I believe that Howard Reinstein fraudulently received unemployment insurance benefit checks in the following names and amounts:

| | |
|---|---|
| Howard Reinstein | $4,425 |
| Steven Tartaglia | 7,885 |
| Chaz Wallach | 6,305 |
| Steven Howard | 5,800 |
| Robert Valentine | 3,220 |
| Allan Hornstein | 4,140 |
| Steven Baker | 1,610 |
| Alexander Sales | 6,730 |
| Total | $40,115 |

I believe Sharon Reinstein fraudulently received unemployment insurance benefits in the following names in the following amounts:

| | |
|---|---|
| Sharon Baker | $3,835 |
| Rose Valentine | 2,930 |
| Sharon Reinstein | 5,130 |
| Caron Hornstein | 4,485 |
| Arlene Sales | 4,360 |
| Total | $20,740 |

Although the State contends that the debtors are jointly and severally liable for these debts, the plaintiff has produced not one shred of legal authority for this proposition and no convincing evidence. Consequently, I find that the debtors are each liable only for the amount as found by me above.

However, each amount must be reduced by credit for the payments already made on the debts. As explained above, Reinstein paid $22,000 to New York State which he maintains was in full payment for his debt and his wife's. *See supra* p. 893. I reject his claim that this payment was in settlement of both debts but, since there is no other evidence as to how it should be apportioned between the debtors, I will apportion it between them *pro rata*.

Applying this apportionment, I find that the total owed by the Reinsteins is $60,855 and so Howard Reinstein, owing $40,115, owes .66 of the total, and Sharon Reinstein, owing $20,740, owes .34 of the total. Thus, he should be credited with .66 of the $22,000 payment, or $14,520, and she should be credited with .34 of the payment, or $7,480. Reducing the $40,115 received by Mr. Reinstein by the $14,520 which he repaid the State leaves him owing a debt of $25,595. Reducing the $20,740 received by Mrs. Reinstein by the $7,480 she repaid the State leaves her owing a debt of $13,260.

I find that both of these debts are nondischargeable pursuant to section 523(a)(2)(A) of the Code, 11 U.S.C. § 523(a)(2)(A), and judgment is granted in favor of the State of New York against Howard Reinstein in the sum of $25,595 and against Sharon Reinstein in the sum of $13,260.

Submit judgment in accordance herewith.